IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.

JOSÉ RAMÓN LÓPEZ REGUEIRO,

    plaintiff,

v.

DELTA AIRLINES, INC.,

    defendant.
_____/

**COMPLAINT FOR DAMAGES**

José Martí International Airport (the "Airport") is Cuba's main domestic and international airport, serving millions of travelers every year, into, out of, and around Cuba. It serves dozens of airlines that use the airport to transport cargo as well as passengers, and operates as the hub for Cuba's two main airlines: Cubana de Aviación ("Cubana") and Aerogaviota. The Airport is a major international airport on par with some of the largest in the world. It was owned and built up by a company owned by José López Vilaboy—plaintiff Jose Ramón López Regueiro's father—who transformed a minor, outdated airport on the brink of demolition by the Cuban government into what the Airport is now. For his efforts, Vilaboy, like so many other Cubans, was left with nothing when Fidel Castro seized power and set up a communist dictatorship, which stole his property and forced him and his family to flee Cuba.

A large and growing number of Cuban, U.S., and international airlines have used and benefited from the Airport for years—and continue to do so—without ever getting consent from the Vilaboy Family[1] and without paying them a single penny in compensation for trafficking, and benefitting from trafficking, in this stolen property. Plaintiff López Regueiro brings this action for damages from that trafficking.

## THE ACTION

1. Jose Ramón López Regueiro sues defendant Delta Airlines, Inc. ("DAL"), under the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. § 6021, *et seq.* (the "Libertad Act"), for unlawful trafficking in his confiscated property in Cuba.

---

[1] The "Vilaboy Family," prior to March 2, 1989, means José López Vilaboy. After March 2, 1989, the date of Vilaboy's passing, the "Vilaboy Family" means Jose Ramón López Regueiro.

## THE PARTIES

2.  Jose Ramón López Regueiro is a U.S. national as defined by 22 U.S.C. § 623(15) and a natural person who resides in Miami, Florida.

3.  Defendant DAL is a Delaware corporation, registered since 1967 with the Florida Department of Corporations to do business in Florida, and with offices in the Southern District of Florida at 2100 NW 42nd Street, Miami, FL 33142.

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the Libertad Act (22 U.S.C. § 6082) and the amount in controversy exceeds $50,000, excluding interest, costs, attorneys' fees, and treble damages.

5.  The Court has general jurisdiction over defendant DAL under Fla. Stat. § 48.193(2) because it is engaged in substantial and not isolated activity within this state by and through its employees, offices and operations in Florida, including its electronic platforms for travel marketing and sales transactions with Floridians, and its operation of passenger flights between Florida and the Airport, which constitute continuous and systematic contacts with Florida, as more fully set forth below.

6.  This Court has specific personal jurisdiction over defendant under Fla. Stat. §§ 48.193(1)(a)(1), 48.193(1)(a)(2), and 48.193(1)(a)(6): because (a) it operates, conducts and carries on business in Florida; has offices in Florida; regularly avails itself of the benefits of its presence in Florida; and committed a tortious act within Florida causing injury to plaintiff, who is a Floridian; committed tortious acts outside of Florida while engaging in solicitation within Florida; (b) because this case arises from defendant's business activity in Florida, tortious conduct in Florida, and tortious conduct outside Florida while engaging in solicitation in Florida,

which constitute minimum contacts and satisfy due process; and (c) because a substantial part of the events or omissions (including defendant's unlawful trafficking in López Regueiro's property through its operation of passenger flights to and from the Airport) that give rise to these claims occurred in this judicial District, as more fully described below.

7.     Defendant's extensive trafficking activities in Florida extend far beyond running interactive websites aimed at Floridians where they can research, purchase, and pay for flights to and from the Airport—which alone would be enough. At all times material to this action, Defendant also: (a) operated daily passenger flights between Florida and the Airport; (b) maintained Florida offices and Airport facilities at Miami International Airport ("MIA") with hundreds of employees; (c) maintained Florida registrations and licenses to do business in Florida; (d) sold and profited from passenger flights between Florida and the Airport; and (e) received substantial revenues from Florida.

8.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and 1391(b)(3).

*A.     Defendant DAL*

9.     DAL is one of the three biggest airlines in United States. It started its services at MIA in 1945.[2] Currently, DAL's presence at MIA is significant, with a total of 23,352 flight operations recorded during the fiscal period ending August 2025.[3]

10.    In 2023 DAL served 3.3 million travelers as the second busiest airline at MIA.[4] This major presence highlights how heavily DAL relies on MIA.

---

[2] Lukas Souza, "Miami International Airport: A Brief History," (Oct. 30, 2024), https://simpleflying.com/miami-international-airport-a-brief-history/?utm (last visited Nov. 25. 205).
[3] See Miami-Dade Aviation Department, Aviation Statistics https://www.miami-airport.com/library/pdfdoc/Airport%20Stats/August%202025/August%2025%20Fiscal%20Yr%20Flight%20Operations.pdf?utm. (last visited Nov. 25. 205).
[4] https://news.miami-airport.com/mia-and-delta-air-lines-celebrate-delta-sky-club-expansion/?utm (last visited Nov. 25. 205).

11. DAL began operating up to a dozen weekly charter flights from MIA to the Airport in 2011 and completed nearly 500 trips before ending the service on December 29, 2012.[5]

12. In 2016, DAL announced its return to Cuba with new Havana service from Miami, presenting it as an important milestone for the airline. DAL emphasized its commitment to delivering strong operational performance and reliable service for travelers moving between Miami and this key international destination.[6]

13. After reinstating a daily Miami-Havana flight in 2016, DAL expanded the route further in 2018 by adding a second nonstop flight from MIA to the Airport, operated five times a week. Defendant publicly emphasized that Miami was a key market for its Cuba operations and stated that this additional evening departure—paired with the existing morning flight—was meant to improve options and strengthen its renewed presence in Havana.[7] DAL continues to offer passenger flights to and from MIA to the Airport today.

## THE LIBERTAD ACT

14. The Libertad Act was passed on March 12, 1996. One of its express purposes is to deter the exploitation of wrongfully confiscated property in Cuba belonging to United States nationals by "protect[ing] United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro Regime." 22 U.S.C. § 6022(6).

15. Title III of the Libertad Act provides U.S. nationals whose property in Cuba was confiscated by the communist Cuban regime with a right of action against those who traffic, as

---

[5] https://ir.delta.com/news/news-details/2016/Delta-to-Serve-Havana-Cuba-from-New-York-JFK-Atlanta-and-Miami/default.aspx?utm (last visited Nov. 25, 2025).
[6] *Id*.
[7] https://pro.delta.com/content/agency/lac/en/news/network-update-archive/2018/july-2018/new-delta-flight-from-miami-to-havana-coming-october-28.html?utm (last visited Nov. 25, 2025).

5

defined by 22 U.S.C. § 6023(13), and who benefit from trafficking in that property. *Id.* at §§ 6081-6085.

16. Title III's effective date was August 1, 1996. Defendants' liability for trafficking under Title III has been "established irreversibly" in the years since.[8]

17. Since the Libertad Act's passage in 1996, defendant has been on notice that trafficking in property confiscated by the communist Cuban regime without the consent of, and compensation to, the owner of a claim to the property could render the defendant subject to liability for well-established, common-law claims such as unjust enrichment, tortious interference, and after-the-fact aiding and abetting. The Libertad Act was passed to provide an effective remedy for this infringement of property rights.

18. López Regueiro now sues DAL, which has trafficked in his confiscated property and has benefitted from others' trafficking, under the Libertad Act.

## FACTUAL ALLEGATIONS

### A. *The Property*

19. The Libertad Act expressly defines "property" to include "any property . . . whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein . . . ." 22 U.S.C. § 6023(12)(A).

20. In 1932, Pan American Airways ("Pan Am") purchased what was then known as Rancho Boyeros Airport from its original owner, Compañia Nacional Cubana de Aviación Curtiss, S.A. Pan Am operated the airport for nearly two decades, providing both cargo and passenger service. During that time, and with the advent of larger aircraft, the Airport facilities

---

[8] President's Statement on Action on Title III of the Cuban Liberty and Democratic Solidarity (Libertad) Act of 1995, 32 Weekly Comp. Pres. Doc. 1265 (July 16, 1996) (G.P.O. authenticated version available at www.govinfo.gov/content/pkg/WCPD-1996-07-22/pdf/WCPD-1996-07-22-Pg1265.pdf).

(particularly the runway) became outdated and insufficient. By the early 1950s, given the lack of modernization and mounting pressure to transfer air operations to another location, Pan Am began looking to sell the Airport. On information and belief offered the Airport to the Cuban government, which rejected the offer. Pan Am then made the same offer, on the same terms, to Vilaboy.

21. On November 14, 1952, Vilaboy, through his company Compañia de Aeropuertos Internacionales, S.A. ("CAISA"), purchased the Airport from Pan Am for $1.5 million in cash and credits against Pan Am landing fees. *See* **Exhibit A**. Shortly after purchasing the Airport, Vilaboy began modernizing it, extending the runway and building a new, modern terminal building. At that time, the Airport was renamed José Martí Airport.

22. In or around May 1959, the communist Cuban regime confiscated the Airport and CAISA, stealing the properties from Vilaboy, who was their rightful owner. Vilaboy and his family were forced to flee Cuba.

23. The Libertad Act defines the term "confiscated" to include the "nationalization, expropriation, or other seizure by the Cuban government of ownership or control of property, on or after January 1, 1959—(i) without the property having been returned or adequate and effective compensation provided." 22 U.S.C. § 6023(4)(A)(i).

24. The Cuban government maintains possession and control of the Airport and has neither returned it nor paid any compensation to plaintiff for its seizure and use. At all times material to this action, the Airport has been the subject of daily business dealings between defendant and the Cuban government.

25. During times material to this action, defendant DAL solicited and sold reservations and operated passenger flights to and from the Airport. On information and belief,

7

Floridians can travel and send mail, excess baggage and cargo to the Airport using defendant's services.

26. Plaintiff López Regueiro is the owner of a 100% interest in CAISA and the Airport.

27. When Vilaboy died intestate in Miami Beach, Florida, on March 2, 1989, ownership of CAISA and the Airport passed to López Regueiro as a matter of law under Florida Statute § 732.108(2)(c).[9] *See* **Composite Exhibit B**.

28. López Regueiro has been in possession of all of CAISA's shares since his father left Cuba. *See* **Exhibit C.**

29. López Regueiro never abandoned his legitimate interest in and claim to the Airport, and, at the time of filing this lawsuit and since, was and is the rightful owner of the Airport, which is stolen property under the Libertad Act, as to which the Act provides a remedy for defendant' trafficking and benefitting from others' trafficking.

30. The Vilaboy Family was not eligible to file a claim with the Foreign Claims Settlement Commission under Title V of the International Claims Settlement Act of 1949 (22 U.S.C. § 1643, *et seq*.), because they were not U.S. citizens when the Airport was confiscated.

**B.    *Defendant Has Trafficked and Continues to Traffic in the Airport Without Compensating the Vilaboy Family***

31. In the decades since it was confiscated, the Airport was expanded and modernized to accommodate an ever-increasing volume of flights into and out of the Airport. Ever since the

---

[9] López Regueiro's birth certificate and several letters from Vilaboy to López Regueiro's mother, Estela Regueiro Villamide, dating back to 1959, acknowledge that López Regueiro is Vilaboy's son. In its November 30, 2010 order, the Florida probate court also confirmed that López Regueiro is Vilaboy's sole descendant, approving and adopting the findings of the Report of Guardian ad Litem issued by Lawrence Levy, Esq., Attached as **Exhibit D.**

confiscation—and continuing to this day—a number of airlines and other businesses, including the defendant, have used the Airport to transport passengers.

32. Many of the flights destined for the Airport with passengers, and, on information and belief, cargo, mail and excess baggage, depart from MIA as detailed above.

33. Defendant transports passengers in violation of applicable Cuban Asset Control Regulations ("CACRs") promulgated by the Office of Foreign Assets Control ("OFAC").

34. The Libertad Act defines a person who "traffics in confiscated property" as one who

> knowingly and intentionally— . . . (ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or (iii) . . . participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person, without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13)(A).

35. The fact that Vilaboy, through CAISA, owned the Airport prior to its confiscation, and that the Cuban government confiscated the Airport in 1959 is well-known and widely publicized, particularly within the airline industry. Accordingly, and particularly given defendant's long history of flight operations in Cuba, including to and from the Airport now and before December 1, 1961, defendant has known at all material times that Vilaboy, through CAISA, was the Airport's owner and that the Cuban government confiscated the Airport in 1959.

36. In addition, since the Libertad Act's passage in 1996, defendant has been on notice that trafficking in the Airport, which was publicly known to have been confiscated by the Cuban government, would subject them to liability:

> I will allow Title III to come into force. ***As a result, all companies doing business in Cuba are hereby on notice that by trafficking in expropriated American***

9

> *property, they face the prospect of lawsuits and significant liability in the United States.*
>
> \* \* \*
>
> Our allies and friends will have a strong incentive to make real progress because, *with Title III in effect, liability will be established irreversibly during the suspension period and suits could be brought immediately when the suspension is lifted*. And for that very same reason, foreign companies will have a strong incentive to immediately cease trafficking in expropriated property, the only sure way to avoid future lawsuits.

President's Statement on Action on Title III of the Cuban Liberty and Democratic Solidarity (Libertad) Act of 1995, 32 Weekly Comp. Pres. Doc. 1265 (July 16, 1996) (G.P.O. authenticated version available at www.govinfo.gov/content/pkg/WCPD-1996-07-22/pdf/WCPD-1996-07-22-Pg1265.pdf). President Clinton's statement rendered defendant's conduct knowing and intentional under the Act as a matter of law.

37. On July 22, 2019, López Regueiro informed defendant of his intent to commence an action unless they immediately ceased to traffic in the Airport, in compliance with 22 U.S.C. § 6082(a)(3)(D). *See* **Exhibit E.** Defendant has had actual knowledge of plaintiff's claim to the Airport since at least July 22, 2019 but has continued to traffic in it.

38. Despite being on actual notice, defendant continues to use the Airport for its economic benefit.

39. Neither López Regueiro nor any other U.S. national, if any, who may have had a claim to the property, ever authorized the Cuban government or the defendant to traffic in the Airport.

40. The defendant has never paid—and the Vilaboy Family has never received—any compensation or indemnification whatsoever for defendant's trafficking of the Airport.

41. López Regueiro has been injured by defendant's trafficking in the Airport without his permission, and without paying any compensation to him. The defendant has been unjustly enriched from its trafficking in the Airport.

## CAUSE OF ACTION

### COUNT I
### Private Right of Action Under 22 U.S.C. § 6082(a)(1)

42. López Regueiro incorporates by reference paragraphs 1 to 41 into this count.

43. This claim is brought under Title III of the Libertad Act, 22 U.S.C. § 6082.

44. Defendants is a "person" as defined by 22 U.S.C. § 6023(11).

45. López Regueiro's property was confiscated by the communist Cuban government.

46. When the Airport was confiscated, and ever since, the Vilaboy Family has owned a claim to the Airport.

47. The defendant has knowingly and intentionally used and benefitted, directly and indirectly, from the Airport by soliciting, selling, and operating, for its economic benefit, passenger services to and from the Airport, which constitutes trafficking in violation of Title III of the Libertad Act.

48. Defendant has conducted this trafficking "without the authorization of any United States national who holds a claim to the property" (22 U.S.C. § 6023(13)) in violation of Title III of the Libertad Act.

49. López Regueiro, in compliance with 22 U.S.C. §§ 6082 (a)(3)(B) and (a)(3)(D), gave notice to the defendant more than 30 days before it is as defendant in this lawsuit. Notwithstanding this notice, defendant has continued to knowingly and intentionally traffic, and benefit from trafficking, in the Airport.

50. Accordingly, López Regueiro has a right to recover damages to be determined under 22 U.S.C. §§ 6082(a)(1)(A)(i) and 6082(a)(3)(C), together with attorneys' fees and costs under 22 U.S.C. § 6082(a)(1)(A)(ii), and treble damages under U.S.C. § 6082(a)(3).

51. Before this action was filed, On May 2, 2019, the United States Government ceased suspending the right to bring an action under Title III, 22 U.S.C. § 6085, which permits plaintiff López Regueiro to seek the relief requested here.

## PRAYER FOR RELIEF

For these good and sufficient reasons, López Regueiro demands a judgment against defendant that:

 i. Awards actual damages under 22 U.S.C. § 6082(a)(1)(A)(i);

 ii. Awards attorneys' fees and costs incurred in this action under 22 U.S.C. § 6082(a)(1)(A)(ii);

 iii. Awards treble damages under 22 U.S.C. § 6082(a)(3)(C);

 iv. Awards appropriate post-judgment interest; and

 v. Awards such other relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

López Regueiro demands trial by jury on all issues so triable.

Dated: November 26, 2025

Respectfully submitted,

**RIVERO MESTRE LLP**
2525 Ponce de Leon Blvd., Suite 1000
Coral Gables, Florida 33134
Telephone: (305) 445-2500
Facsimile: (305) 445-2505
E-mail: arivero@riveromestre.com
E-mail: jmestre@riveromestre.com
E-mail: arolnick@riveromestre.com
E-mail: amalave@riveromestre.com

By:   /s/ Andrés Rivero
ANDRÉS RIVERO
Florida Bar No. 613819
JORGE A. MESTRE
Florida Bar No. 88145
ALAN ROLNICK
Florida Bar No. 715085
ANA MALAVE
Florida Bar No. 83839

13