# EXHIBIT A

Translation

No. 149

DEED OF SALE AND MORTGAGE

In the city of Havana, on July 28, 1955.

Before me: Dr. Francisca Casas y Gomez; lawyer and notary public of the College and District of this capital city, and residing in the same city:

There appeared:

Party of the first part - Mr. WARREN A. PINE, which by reason of his nationality is the full name used by him, a native of the United States of America, American citizen, of legal age, married, businessman and resident of this city, at No.105 Calle 23, district of Vedado, Alien Card No.361,799;  and

Party of the second part - Mr. JOSE LOPEZ VILABOY, a native of Regla, this province, Cuban citizen, of legal age, married, journalist and resident of this city, at No.162 Calle Mercaderes.

Qualifications of Contracting Parties:

Mr. Warren A. Pine appears as representative and attorney-in-fact of the company called "PAN AMERICAN WORLD AIRWAYS, INC.", in Spanish, "Compañía Pan Americana de Comunicaciones Aéreas Mundiales", which is a company constituted under the laws of the State of New York, United States of North America, pursuant to public instrument executed on February 26, 1927, before Frederick E. Scheuer; Notary Public of the city of New York, having a branch office at No.252 Calle Paseo de Marti, Havana, and its principal office at No.135 East 42nd Street, Manhattan, city of New York, United States of America; the original name of said Company, namely, Pan American Airways, Inc., -in Spanish, "Compañía Pan Americana de Comunicaciones Aéreas," having been changed to its present name by resolution of December 28, 1949, executed before

-2

Lillian L. Olsen, Notary of New York, United States of America;
its constitutive bylaws as well as its certificate of incorpora-
tion having been recorded by instrument dated September 21, 1927,
executed before Dr. Oscar A. Montero y Baldarrain, Notary of
Havana, and its change of name by instrument No.15 dated January
26, 1951, executed before Dr. Nestor Carrillo de Albornaz y
Párraga, Notary of Havana, the first-mentioned of said instruments
having been recorded in the Mercantile Register of Havana, on
page No.4277, folio 176, Volume 177, Book of Corporations, inscrip-
tion first, and in the Central Register of Corporations, Section
Second of Havana, on page No.1183, folio 100, Volume 13, inscription
first; the second, which was declared exempt from payment of fiscal
fees in the Fiscal Zone Oriente de la Habana, on February 9th of
said year, was recorded in the Central Register of Corporations in
Section Second, on page No.1183, folio 100-162, Volumes 52 and 13,
inscriptions first and fifth, and in the Second Mercantile Register
of Havana, on page No.4277, folio 118, Volume 377, Book of Corpora-
tions, inscription 12.

That on September 13, 1948, before Mr. David E. Grant,
Notary of the State of New York, United States of America, the
Company called "Pan American Airways, Inc.", in Spanish, "Compañía
Pan Americana de Comunicaciones Aéreas," granted to said Warren A.
Pine a full power of attorney, to be used and executed in the Re-
public of Cuba, with the powers stipulated therein, the original of
/said power of
attorney having been protocolized, with all the requirements and
formalities stipulated by law, by instrument No.164, dated October
8, 1948, executed before Dr. Nestor Carrillo de Albornaz y Párraga,
Notary of this city; and said contracting party affirms that the
aforementioned power of attorney has not been revoked, suspended
or limited in any way, and that he has sufficient authority for
the execution of this document.

And Mr. José Lopez Vilaboy appears in his capacity
of general attorney-in-fact of the mercantile company called
"Compañía de Aeropuertos Internacionales, S.A.", constituted
for an indefinite duration,
in accordance with the laws of the Republic of Cuba,/of Cuban
nationality, domiciled at No.162 Calle de Mercaderes, by in-
strument No.176, dated October 9, 1952, executed before the
undersigned Notary and contained in his files, and on which
document fiscal fees were paid for the Fiscal Zone Oriente de
la Habana, on December 11th of the said year, - according to
receipt No.618,914, and recorded in the Central Register of
Corporations, Section Second of Havana, on page No.5889, folio
121, Volume 79, inscription first, and in the Second Mercantile
Register of Havana, at folio 147, Volume 495, page 11,687, Book
of Corporations, inscription first; the capital of said Company hav-
ing been increased pursuant to resolution adopted at the Special
Meeting of Stockholders held on December 6, 1952, a certification
of said resolution having been protocolized by instrument No.1,
dated January 2, 1953, also executed in the presence of the under-
signed Notary and filed in his archives; the corresponding fiscal
fees having been paid on said document, which was recorded in
Section Second of the Register of Corporations and in the Second
Mercantile Register of Havana.

The authority of Mr. José Lopez Vilaboy for the execu-
tion of this document is contained in the general power of attorney
which said Compañía de Aeropuertos Internacionales, S.A. granted to
him in instrument No.2, dated January 2, 1953, also executed in the
presence of the undersigned Notary, and filed in his archives; and
said Mr. Lopez Vilaboy affirms that the afore-mentioned power of
attorney has not been revoked, suspended or limited in any way,
and that he has sufficient authority for the execution of this
instrument.

The contracting parties declare that they have the full

use and enjoyment of their civil rights, and in my judgment,
-nothing to the contrary appearing- they have the necessary
legal capacity for the execution of this document, in accord-
ance with the laws to which they are subject and which are
known to me; and after declaration by both appearing parties,
that the Companies represented by them herein have not been
dissolved or liquidated and are not in a condition of bank-
ruptcy or suspension of payments, Mr. Warren A. Pine, in his
aforesaid capacity, declares:

FIRST:  That his principals are the full and absolute
owners, with positive and undisputed ownership, of the property
described as follows:

Rural Property.  Land on which the Rancho Boyeros Air-
port is located, formed by the merging of the following real es-
tate - Soledad, San Diego, Jaguey, Soledad, Nuestra Señora del
Rosario, Morales, part of Lot No.1 of Los Palos de Campeche, marked
by letter "C", lot No.3 of Los Palos de Campeche; lot No.1 of the
San Luis property; lot No.2 of Los Palos de Campeche; lot No.4 of
Los Palos de Campeche; second site of San Luis; lot No.2 of the
Don Luis property and the "Placeres" property - located in the
district of Boyeros, Municipal Precinct of Santiago de las Vegas,
in this province of Havana.

Area:  The aforesaid property has a total area of one
million, one hundred and thirty-one thousand, two hundred and ninety-
one/meters, thirteen square decimeters, equivalent to one hundred
and thirteen hectares, twelve areas, ninety-one centiareas and 1.3
miliares, i.e., eight caballerias, one hundred and thirty-nine cor-
deles, one hundred and thirty-nine varas and forty-nine tenths
square varas.

Boundaries:  Bounded on the north by Parcel "B" of Lot
No.1 of Los Palos de Campeche, land separated from the "San Francisco"

-5

property "German"; part of the "Figueredo" property, Wajay Road, and the "Caimito" property; on the south, bounded by the property of José Vichet, called "La Herminia"; part of the "Figueredo" property; "Pajarito" property, separated by a road or right-of-way; the "Placeres" property, with the "Ojo del Agua" road in between; and, finally, the Wajay highroad, today called "Avenida del Aeropuerto de Rancho Boyeros."   On the east, by lands segregated from the "San Francisco" property, separated by a right-of-way; "San Juan" property, today Pan American division, part of the "San Juan" property; "German" property, "Las Monjas" property, lands belonging to Rafael Samales, today "Reparto Mercedes," Western Railroad line, "Placeres" and "Ojo del Agua" properties.  On the west, by the Villanueva Railroad, today the Havana Railroad; part of the "Wajay" Lane, "Figueredo" and "Caimito" properties.

At the present time, the aforesaid property is crossed by two public roads: the first, the Wajay Highway, and the second, the Wajay Lane.  The first is eighteen meters, sixty-five centimeters wide, and intersects the runway that has been constructed on the property.  The Wajay Callejón measures seven meters in width.  The other roads or rights-of-way which were located between the properties that have been merged, may be considered as extinguished, since they were formerly used to give access to other properties, today constituting a single area.

SECOND:  That his principals are also the full and absolute owners of the buildings and constructions hereinafter enumerated, and also of the improvements and installations consisting of equipment, machinery, etc. also hereinafter enumerated, and that his principals are at present in possession thereof.

The buildings constructed are the following:

I.  Passenger Station.  Building consisting of two floors, a Tower comprising two floors, and a wing, on the western side, in which the quarantine, immigration and Customs sections are located.

The building is a reinforced concrete construction, floors and
ceilings of monolith tiles, the main section having two floors.
The exterior measurements are forty-one meters, forty centimeters
in front, by thirty-three meters in depth.  The two-floor Tower
has the following exterior measurements: seven meters forty-five
centimeters by seven meters forty-five centimeters in diameter;
octagonal in form, the four larger sides measuring four meters
fifteen centimeters in length, and the four smaller measuring one
meter fifteen centimeters.  The floors have a thickness of twenty-
five centimeters, and the interior pillar is five meters on the
ground floor, four meters, five meters seventy centimeters on the
second floor; the main building five meters, and five meters twenty
centimeters on the first and second floors of the Tower.  The wing
on the western side, recently added and used for quarantine, immi-
gration and Customs, measures six meters in front, by twenty-two
meters in depth, in the section used for quarantine and immigra-
tion, with an addition in the quarantine section for medical exam-
ination, measuring three meters eighty-five centimeters by five
meters fifty centimeters; the section used for Customs (delivery
and inspection of baggage, international travelers) measures twenty-
four meters in front by ten meters in depth; on its northern side
it has a room for depositing baggage and valuables, which measures
eight meters sixty-five centimeters, by five meters, - all exterior
measurements.  The building is of reinforced concrete, with roof
of monolith tiles, as has been previously stated, but on its northern
side it has a small wooden roof for the protection of the baggage-
handlers, baggage and passengers, covered with a sheeting of mixed
fibre and cement.  Running from the western side and the entire
length of the airplane parking platform, there is a sidewalk cov-
ered with a wooden roof, and sheeting of mixed fibre and cement,
without walls, measuring one hundred and eight meters in length by
four meters twenty-five centimeters in width.

Lower Floor.   Main building.  The lower floor on the southern side, facing the highway, has thirteen windows and four doors; on the north side, which faces the runway, it has ten windows and ten doors; on the east, six windows and two doors; and on the west, seven windows and one door.  This floor is occupied by the following offices:  Northeast corner:  Operations – area, sixty-two square meters; to the south, communications center, – area, thirty-one square meters; Meteorological Section – twenty-seven meters ninety square decimeters; electric and telephone switchboard section, 17.98 square meters; and, finally, in the southeast corner, Clipper Club store – area, 19.84 square meters. Then, continuing to the west, there is a hall with a time clock and a card stand – area, 15.60 square meters; to the south, an office, with an area of forty-five square meters, and at the end there is a hall from which one enters the Clipper Club store, the Clearance Department, and the stairway to the second floor, – area, 5.48 square meters.  Continuing – to the west, at the northern end there is the Cargo and Baggage Delivery Section for domestic flights, – area, 15.18 square meters; to the south, the Traffic Counters of PAA, CCA, CMA, LACSA and IBERIA – area, 76.54 square meters.  Here there is also the counter of the Currency Inspector; then there is a room for the custody of baggage – area, 13 square meters, and at the southern end there is the space under the stairway leading to the second floor, and a men's room, – area, 16.00 square meters.

In the center of the building, occupying an area of 293.25 square meters from its northern facade, and with a length of 25.50 meters, there is the Passenger Salon, containing a showcase of souvenirs and the International Telegraph counter; leading from the Passenger Salon, and to the south, the office of the Airport Physician, – area, 16.80 square meters; entrance corridor leading to the Salon; office for physician and cashier of the Airport, – area, 18.40 square meters, office of the Airport Cashier, 16.80 square meters.  On the western

side of the Salon there is the Traffic Counter Secton of the following companies: KLM, NAL, BOAC, BNF, C&S and LAV, occupying an area of 121.20 square meters, each counter occupying 15.90 square meters, the difference representing space used by all the companies. Adjoining this Section, and with an entrance into the Section of C&S, there is a section occupied by this company, with an area of 27.7 square meters, including an office and sanitary services. The southwest corner of the ground floor is occupied by offices of the Customs Department, the Administration, etc., comprising an area of 171.68 square meters; continuing from the Customs offices and toward the northern side, there is the Immigration Room, with an area of 120.28 square meters; on the southern side of this room there is a closet with an area of 2.50 square meters, the office of the Passenger Tax Collector and a corridor, area, 14.40 square meters. On the northern side of the Immigration Hall there are two quarantine sections, one with an area of 53.76 square meters, with a small room of 6.84 square meters on the east, which will be used in the future for a washroom, etc.; the other section having an area of 49.56 square meters, with a room on the west for detention, comprising an area of 18 square meters; both quarantine sections face along the northern side of the building. In the section containing the Customs Offices used for inspection and delivery of baggage of international passengers, there are the following divisions: a room for the doctor, with entrance along the west wall of the Immigration Section, comprising an area of 6.82 square meters; a rest room, lockers and washroom for the inspectors, with an area of 17.84 square meters, the remainder of the section comprising 190.13 square meters. Outside of this section and on the north side there is a room comprising 39.60 square meters, used for the custody of baggage and valuables.

Second Floor. Main Building. The south side of the second floor has eleven windows and no door; the north side has nine windows, three large windows and five doors; the east side, eight double windows and no door; and the west side, four double

windows, four large calobar windows and no door; the large calobar
windows belong to the Clipper Club. On this second floor there
are the following offices: northeast corner, with an area of 24.27
square meters, office of the Airport Administrator; south, offices
of the General Administrator of AUSA, and his secretary, 11.72 square
meters, and 9.00 square meters, respectively; continuing on the
south, eastern facade, offices of the General Accountant of AUSA and
his Secretary, 11.72 square meters and 9.4 square meters, respective-
ly. Then the printers and radio operators' section of RACSA, 83.47
square meters, and, finally, in the southeast corner, the office of
the Manager of the RACSA Radio Station and his secretary, 12.40
square meters; office of the RACSA Radio Workshop Superintendent,
3.96 square meters; communicating corridor, 2.53 square meters.
Continuing from this section and starting from the northern facade,
the general office of AUSA, with the administration and accounting
sections, 76.4 square meters; to the south, the Radio Workshop and
Printers Section of RACSA, 22.18 square meters; then the canteen,
46.47 square meters; the storeroom of the canteen, 13.86 square
meters, sanitary services of the canteen, 9.49 square meters.
Then, along the southern facade, a corridor and men's room, 8.68
square meters, and the space for the stairway from the ground
floor, 16.80 square meters. Occupying the central part of the
second floor and along its northern facade, there is the open ter-
race for the public, 90.20 square meters, then the roofed terrace,
40 square meters; the dining-room for passengers, 96.60 square
meters; the corridor and central space, 138 square meters; and,
finally along the southern facade, and from east to west, there
is the men's room for passengers, 16.23 square meters; at the
northeast angle of this room, there is a communicating corridor,
with the stairway space, 2.25 square meters; then, to the west,
the office of the Customs representative of KLM, the representa-
tive of SASA, and the Surveyor of AUSA, - 19.95 square meters;

-10

and finally, the ladies' room (dressing-room), 18.27 square meters.
The northeast corner is occupied by the Clipper Club, 187.10 square
meters, then the restaurant and the employees' dining-room, one of
the sides along the western facade, 138 square meters, and occupying
the southwest corner, the restaurant kitchen, 109.29 square meters.
Between the kitchen and the ladies' powder-room, along the southern facade,
there is the bath and the men's room, 14.05 square meters.  On the roof
of the second floor and above the Clipper Club, at the base of the tower
there is the room containing the Clipper Club air-conditioning equipment;
this room measures 5.22 meters by 5.22 meters, has two windows on the
north, one on the west and a window and a door on the south.  Adjoining
the light in the central part of the roof, and at the southern side,
there is a small room, without windows and with one door, which measures
3.50 meters by 1.10 meters.

First floor of the tower.  On the first floor of the tower
there is the air traffic control office (A&C); the interior measures
43.33 square meters, has eleven windows and a door.

Second floor of the tower.  The second floor contains the
flight control tower, 18.08 square meters, the walls being of glass;
there is one door.

The tower has two offices for officials.  The second floor
contains installations of antennas, a reflector or double revolving
beacon.

II.  Air Cargo Terminal.  Building constructed on the site
of the airport, adjoining the road toward the "Aguada del Cura."  Exter-
ior measurements, 61.50 meters on the north and south, and 24.50 meters
on the east and west.  It has seven windows, four doors for cargo and
three doors for the personnel, on the north, toward the runway; on the
south it has five windows, five doors for cargo and one for the person-
nel; on the east and west, the same number of windows, no door.  This
building, consisting of one floor, is constructed on an elevated founda-
tion, with metal framework, floors of concrete, brick walls, and roof of

corrugated asbestos and cement.  The interior is divided into sections; at the eastern end there is a large room, 296.43 square meters, used for offices of the Customs authorities, employees of the Terminal, and Customs dispatchers; at the western end, the cargo warehouse, 1,024.25 square meters.  Between these two sections there is a corridor, 106.25 square meters, with exit at the south.  At the end of this corridor and to the north, there are two rooms, one, used for storage, 11.72 square meters and the other 9.25 square meters.  The doors of both open into the corridor.  Continuing from these two rooms, and with doors on the north, there are the sanitary services and lockers for employees, with a total area of 18 square meters.

III.  On the airplane parking platform and along the covered pavement, there is the locker room for the line employees, measuring 9.85 meters by 4.28 meters, comprising a total area of 42.16 square meters.  Then there is the room of the C&S, 4.60 meters by 4.28 meters; exterior measurements, and with an area of 19.69 square meters.  Then, along the same roofed pavement, the offices of LAV; this section measures 4.80 meters by 4.28 meters, comprising an area of 20.54 square meters. The type of construction of these three rooms is as follows: "taquilla" room of the line employees, the same as the roofed sidewalk, wooden framework and roof of fibre and cement, with wooden walls; three windows and one door on the north and two windows on the south; no windows on the east and west; the C&S section is constructed of brick, with fibre and cement roof; two doors on the north and one window on the west; two windows on the south.  The LAV section is constructed of cement blocks, and the roof of fibre and cement; a door and one window on the north, and one window on the south and west.

IV.  Near the roofed sidewalk and close to the Customs section and the space used for delivery of baggage of international passengers, there is a room measuring 3.95 meters by 3.95 meters, exterior measurements, comprising an area of 15.60 square meters, constructed of cement blocks, roof made of monolithic plaques, used for fumigation of baggage, etc.  This has a single door on the northern side.

V. "Cuarto de taquillas" (locker room?) for the baggage handlers, originally used for the hydrogen generator for balloons used for meteorological observations. This is near the new Customs addition on the west side of the Passenger Station.     Exterior dimensions - 3.95 meters by 3.95 meters, with an area of 15.60 square meters.     It has a door on the east and a window on each of the other sides. It has one floor, with a staircase leading to the roof. Brick construction, railed roof, filled in with bricks covered by cement.

VI. Wooden shed, 10.95 meters in length by 3.30 meters in width, comprising 36.13 square meters, located near the northeast corner of the Passenger Station, and between this building and the former cargo warehouse. This shed is vacant. Constructed of wood, with cement floors and roof reinforced with tar paper. On the north it has three doors and two windows; on the west, one window; on the east, one window and a door; and on the south, one window and two doors.

VII. Former storehouse for cargo. This contains the sections for the mail, the commissary, the Port Steward, "Taquillas," the cleaning porter, storeroom for cleaning equipment, and the section for the proposed Employees' Restaurant, containing at present the storeroom for materials of AUSA. Construction: pillars of reinforced concrete, connected by brick walls, cement floors and metal framework for the roof, covered by fibre-cement boards. Exterior dimensions - 36.80 meters in length by 9.15 meters in width, the length running from northwest to southeast; parallel with the Hangar and about 10 meters distant, it is situated between the Passenger Station and the Hangar. On the northwest side it has one door and one window; on the southeast, one window; on the northeast, eight windows and three doors; and on the southwest, seven windows and one large doorway for ingress of cargo. At the extreme northwest end, in the west corner, there is the office for mail, 18.43 square meters, and in the northern corner,

the storeroom of the Port Steward, 26.22 square meters; then, next to
Mail Office, a complete bathroom for the mail clerks and pursers, 4.05
square meters; then to the southeast, next to the bathroom, there is
the bedroom and the locker room of the Custodian, 19.19 square meters;
next to the storeroom of the Port Steward, there is the office of the
Commissary and the Port Steward. Adjoining these two offices there
is the locker room of the cleaning porters, 43.56 square meters; the
southeast wall of this room connects with sanitary services, 5.77
square meters, and showers, 5.40 square meters. In the same section
there is the ladies' room, 4 square meters, and men's room, 4.66
square meters, for the contemplated Employees' Restaurant. To the
southeast there is the room which is to be used for storing cleaning
equipment, 7.95 square meters. Finally, occupying the entire south-
east end of the building, there is the section for the Employees'
Restaurant, at present occupied by the Purchasing Department and
storeroom of AUSA, - 159.60 square meters.

VIII. A small house for the watchman-porter, located
between the former cargo warehouse and the former Customs and Cargo
Office, at the entrance giving access to the section of workshops.
Dimensions, 1.28 meters by 1.28 meters, exterior; comprising 1.64
square meters. This is constructed entirely of wood, and is movable.
Aluminum roof, a door in front and a window on each side.

IX. Former Cargo and Customs offices, projected motor
workshop; construction, pillars of reinforced concrete, brick walls,
roof constructed of beams and rafters, filled in with bricks, covered
by concrete. Exterior dimensions - 32.93 meters long by 9.15 meters
wide. At one side, (north), it has an addition, consisting of a wood-
en roof covered with aluminum planks, no walls - 32.93 meters long by
8 meters wide. This building is located at the boundary of the pro-
perty, toward the railroad, and to the southeast of the former cargo
storehouse. The interior is divided into three sections and is at pre-
sent vacant. At the northeast end there are the sanitary services,

-14

the interior area comprising 25.37 square meters.  The building, including the wooden roof, occupies an exterior area of 564.75 square meters.  On the northern side it has four windows and seven doors (two for cargo and five for the personnel); on the south it has seven windows, and on the east, two windows and also on the west, two windows.

X.  Materials Storehouse.  Between this building and the future motor workshop, there is a roof that has just been completed, continuing from the storehouse roof, 5.18 meters long by 10.6 meters wide, without walls, constructed of wood and covered with aluminum planks.  The storehouse is to the south of the Hangar and measures – Exterior, 36.57 meters long by 10.6 meters wide, consisting of two sections, the storehouse itself, and offices and sanitary services. The interior dimensions of the storehouse are 333.19 square meters, and the area of the office, which is located in the northwest corner, is 22.77 square meters; next to the office and in the southwest corner, there are the sanitary services, 5.19 square meters, and between these and the storehouse itself, with a door for the office, there is a small room, 6.70 square meters, used for storing office equipment, etc.  The building has four windows and three doors on the north, three windows, no door, on the east and west, and seven windows and one door on the south.

XI.  Hangar.  This building occupies a total area of 1,972.81 square meters.  The hangar itself measures 36.58 meters by 36.58 meters, with a total of 1,338.10 square meters.  Metal framework, brick and fibre-cement walls; it has a sliding door, divided into sections, which occupies the entire front, on the north side; along the sides and back, three-quarters of the way up from the ground, there are windows for lighting and ventilation.   In the northwest corner, there is the room containing the emergency electric equipment and the shop of the electrician; this and the other installations, together with the electrician's shop, occupy an area of 52.47 square meters (9.90 meters long by 5.30 meters depth, exterior dimensions).

-15

Brick construction, roof of fibre-cement planks, one window and
a door on front, to the west, and a window on the south side.
On the east side of the hangar and along its entire length,
there are the sanitary services of the hangar, the office of the
Hangar Superintendent and the motor workshop.  The sanitary ser-
vices and the lockers of the mechanics are at the extreme north,
with an area of 56.48 square meters; between these and the motor
workshop, there is the office of the Hangar Superintendent, 17.55
square meters; and finally, occupying the rest of this addition,
there is the motor workshop, 227.15 square meters.   This addition
is supported by the brick wall and metal pillars of the east side
of the hangar; the exterior wall of the annex is of brick, with
concrete pillars, and fibre-cement roof, metal framework.  The
north wall has two windows.  The east has seventeen windows, and
the south has two windows and a door.  On the south side of the
hangar and adjoining its outside wall there are the radio work-
shops, and the soldering and metal workshops.  The radio workshop
occupies 97.20 square meters, and on its south side it has six win-
dows and a door; on the west, a door and one window.  The radio
workshop is located at the southwest corner of the hangar.  Next to
the radio workshop, to the east, there is the metal workshop,
65.88 square meters; on its south side it has five windows and a
door.  Finally, in the southeast corner of the hangar there is the
soldering workshop, 37.4 square meters; it has a window on the south.
The corner comprising the section between the south wall of the motor
workshop and the east wall of the soldering workshop is covered by a
roof of wood and fibre-cement, and is used as an extension of the
motor workshop; approximate area, 47 square meters.

       XI. Butler Building.  Metal construction, walls and roof
with aluminum planks.  This building  runs from northwest to south-
east; measures 30 meters by 12 meters; on its north side it has two
windows and a door, same on its south side; on the east it has four-
teen windows, no doors; and on its west it has twelve windows and two

-16

doors.  The extreme north of the building is occupied by the hy-
draulic workshop, 72 square meters; then come the Instruments and
Accessories workshops, both with the same area as the hydraulics
workshop, e.g., 72 square meters, and finally, occupying the
extreme south of the building, there is the Propellers workshop,
144 square meters.   This building is parallel with the hangar, on
its eastern side, and at a distance of approximately 3 meters.

XII.   Small wooden house located near the southeast
corner of the Butler Building, the floors, walls and roof con-
structed entirely of wood.  The roof has a tar paper covering.
Exterior measurements - 2.20 meters by 1.58 meters, - 3.48 square
meters.  It has a door in front and a window on each of the other three
sides.  It is used by the chief mechanic when a DC-4 is overhauled
on the ramp at the side of the Butler Building.

XIII.   Between the storehouse for materials and the
boundary line dividing the company's property from that of the rail-
road, there is a wooden building, which has one floor and a gal-
vanized zinc roof.  Exterior dimensions, 36.80 meters in length, north-
east to southwest, by 7 meters in width.   At its extreme west, there
is the carpenter workshop, 123.19 square meters, and to the east, the
Production Control office, 24.30 square meters.  Between this office
and the carpenter workshop there is the Motor Testing workshop, -
98.21 square meters.  The north wall of this building has eight
double
doors and two windows; the south wall, two doors and nine double
windows; the west wall has a door, and the east wall has a double
window.

XIV.  Office of the Maintenance Superintendent - located
near the eastern end of the Production Control Office; occupies an
area of 23.5 square meters; dimensions, 6.88 meters by 3.35 meters.
Brick construction, partition walls, brick and rail roofing; one
door on the north, two windows on the east and west, and one double
window on the south.

XVI.  Building situated to the southeast of the hangar,
and east of the materials storehouse and the office of the Main-
tenance Superintendent, with the following exterior dimensions:
facing the west, 23.80 meters from north to south, and 8.7 meters
in depth.  It is shaped in the form of an "L" and has concrete
pillars reinforced with dowels and brick walls.  The roof has a
framework of wood, covered with galvanized zinc.  In this build-
ing there is located at its northern end, which we might call the
horizontal end of the "L", the Sand-Blast workshop, comprising an
area of 33.54 square meters.  In the vertical section, at the
southeast end there is the space used for the mechanics' school,
comprising 33.6 square meters.  Between the school and the sand-
blast workshop, there is the painting shop, divided into two sec-
tion, comprising a total area of 75.24 square meters.  The north-
west side of this building has no doors or windows; the southeast
side has two windows, the northeast side has five windows, and the
southwest side five doors.

XVI.  To the north of the sand-blast shop and east of the
hangar there is the Fuel Control Office, occupying an area of 62.11
square meters.  One-floor building, brick walls, brick and rail roof-
ing, concrete covering.  The southwest side has one door, the north-
west one window; the northwest and southeast sides have no doors or
windows.

XVII.  Shed for gasoline pumps.  This consists of the shed
itself in which the pumps are installed, occupying an area of 11.22
square meters (3.35 meters by 3.35 meters), and an outside roofing
with the same dimensions as the shed, at the northwest side, and cover-
ing the outside installations.  The shed is constructed of brick,
wooden roof covered with galvanized zinc sheets.  The attached roofing
is of wood, no walls, aluminum sheeting.  The shed has three windows,
one each on the northwest, southeast and northeast, and a door on the
southwest side.  It is located near the northeast side of the paints
workshop.

-19-

XVIII. Wooden shed near the boundary line, in the southeast corner of the Airport. Consists of the main structure with exterior dimensions of 8.92 meters by 8.67 meters. On the west and east sides its roof extends beyond the building for 4.25 meters on each side by 5.82 meters in depth. In the northwest corner of the building there is the belting workshop, occupying 17.46 square meters; in the northeast corner, a section for the storing of used parts and articles which still have some value, 34.34 square meters. The southeast corner is occupied by the ground mechanics' workshop, 16.81 square meters. In the southwest corner there is the office of the airways foreman and the storeroom for airways equipment, 8.55 square meters. The building has two doors, no windows, on its north side, no doors or windows on the south; on the east it has a door, no windows, and on the west there are two windows and one door. Wooden construction, with galvanized zinc roofing.

The interior of the site contains the following runways, taxiways and parking platform:

Runway: Length, 4800 feet; width, 150 feet. Asphalt surface. For the first 4000 feet, commencing from the northeast end, the runway is constructed with a Telford base of 30 centimeters consolidated thickness, a macadam layer with asphalt irrigation (1.5 gallons per square meter), gravel finish with asphalt irrigation (0.3 gallons per square meter), with a total thickness of 10 centimeters. Over the macadam, a coating of pre-mixed asphalt (graduated gravel and asphalt – R.O.2), with a total press-rolled thickness of 5 centimeters. Since its construction in 1945, the runway has been refinished several times, and repairs have been made at the northeast end (23), employing for these repairs the method used for the construction of the remaining 800 feet, described as follows:

For the final 800 feet, commencing from the northeast end (23), a different method was used. The 5 cm. surface is laid on a base of consolidated "cocó" in 6-inch layers, making a consolidated total of 12 inches. The surface was pressed down with irrigated asphalt as a finish, with an additional coating of premixed asphalt with the same characteristics as the rest of the runway.

Taxiways. Two taxiways, connecting the apron or platform facing the passenger station with the landing runway. The second taxiway was repaired during the early part of 1952, removing the old base, which was of the same construction as the 4000' runway, and replacing it with a 12" "cocó" base, 12 inches thick and with a rolling surface of premixed asphalt 5 cm. thick. This second taxiway is 750' long by 50' wide. The first runway is of the same construction as the old runway, with a Telford macadam base and a surface of premixed asphalt, 5 cm. thick. Dimensions, 1200' feet in length by 50' in width.

Apron: The aircraft parking apron or platform, facing the passenger station, can be considered as divided into three sections. The first or central section is 400' long by 200' wide. A portion of this is of concrete, measuring 400' in length by 85' in width. Base of "rajón", 20 cm. thick, concrete surface, 10 cm. The rest of the apron, 400' by 115', is of the same type of construction as the Telfors-Macadam runway, with surface of premixed asphalt, 5 cm. The right zone of the apron, facing toward the runway, opposite the hangar and one side of the Butler Building, form somewhat irregular, used as a platform for repairs to the DC-4 equipment, has an area of 3,350 square meters. The left section of the apron, used for the parking of international planes, also somewhat irregular in form, has an approximate area of 6,450 square meters. These two aprons are constructed with a "cocó" base, 12 inches thick, rolling surface 1 inch thick. From the apron facing the Passenger Station, and up to the apron in front of

-20-

the Air Cargo Terminal building, there is an asphalt road, 150 meters long by 5 meters wide, covering an area of 750 square meters.  In the vicinity of the Cargo Building there is a section used for parking trucks and unloading, - comprising an area of 3,970 square meters.  In front of the Cargo Building there is the apron or platform for the maneuvering and unloading of the planes, comprising an area of approximately 6,150 square meters.  These two platforms have a 12" "cocó" base, with 5 cm. of premixed asphalt.

The various buildings and departments of the site contain the following equipment, implements, etc., used for the purposes for which the property is designed:

Meteorological Equipment

4 theodolites

2 hydrogen generators

1 barograph

1 time clock

1 signal clock.

Tools and Implements - Hangars and Workshops

35 baggage carts

7 passenger ladders

1 mowing-machine

5 fire-extinguisher wagons

1 hydraulic bench

1 electric saw with work bench

4 supports for loading gasoline

1 generator

1 conductor mat installed in a tractor

4 platforms

3 10' conductor mats

1 baggage ladder

4 battery chargers

-21-

2 jacks

1 leveling apparatus

2 current generators for aircraft

2 levers for pushing aircraft

1 service cleaning cart

1 alcohol service cart

1 two-legged stand

2 oil suppliers

1 elevating platform

1 motor support

1 tripod

1 hydraulic jack

1 fire-extinguisher cart

8 rudder holders

1 Davis tester

1 metal tester

1 temperature gauge

1 bolt wrench

1 barrel for alcohol.

Automotive Equipment

1 air-conditioned Chevrolet truck

1 Mack truck

1 tractor

1 air-conditioned vehicle

1 fire-extinguisher vehicle

Office furnishings and Equipment

2 lamps

3 refrigerators

1 freezer

4 safes

8 ventilators

3 clocks

2 billing machines

5 adding machines

11 desks

11 sofas

7 weighing machines

2 conductor mats

1 railing

1 counter

3 shelves (cabinets?)

1 amplifier
1 file case

**Titles.**   The property described in Clause First, as well as the equipment, machinery, properties, installations, buildings, constructions and improvements specified in the preceding clause, pursuant to title of / and description of property according to instrument No.1,415, of October 22, 1952, executed in the presence of Dr. Alfredo Castellanos Serra, Notary of this city, and supplemented by No.1,695 of December 4, 1952, executed before Dr. Alfredo Castellanos Serra, the aforesaid Notary, which documents were ratified by instrument No.727 of May 14, 1953, executed before the same Notary, Dr. Alfredo Castellanos Serra, all of which were declared exempt from payment of fiscal fees for the Fiscal District of Bejucal, on November 24, 1952, and January 8, and June 2, 1953; the first of said instruments as well as the other two having been recorded in the Bejucal Property Register, at folios 152 and 153 of Volume 129, Municipality of Santiago de las Vegas, property No. 6,901, inscriptions first and second.

**Liens.**   That, as declared by the deponent, under the responsibility of his principals, both the property described in Clause First and the buildings, installations, properties, etc. specified in Clause Second, are free from all liens or encumbrances,

and therefore, by agreement with the other party to this in-
strument, they dispense with the certification of the Property
Registrar, which I, the Notary, have pointed out to them it
would be advisable to append to this document.

THIRD.   That for the purpose of effectuating the terms
and conditions agreed to by his principals with Compañía de Aero-
puertos Internacionales, S.A., he hereby declares:

That in his capacity of attorney-in-fact, and in behalf
and representation of the corporation called "Pan American World
Airways, Inc."-in Spanish, "Compañía Pan Americana de Comunica-
ciones Aéreas Mundiales"- he sells, conclusively and permanently-
in favor of Compañía de Aeropuertos Internacionales, S.A., the
real estate described in Clause First of this instrument, with
all its entrances, exits, access, rights-of-way, rights and actions,
and those attached or belonging to it, as well as each and all the
buildings, constructions, installations, equipment and machinery, as
described in this instrument, transmitting to the purchaser owner-
ship and possession of said real estate and other properties, with
everything attached or belonging thereto, so that it may freely dis-
pose thereof as its property, without reservation or limitation of
any kind, and free from liens, by virtue of this instrument, which
he executes as proof of actual delivery and possession.

FOURTH.   That the sales price is One million fourteen
thousand four hundred and thirty-four pesos and ninety-nine centavos,
official currency, which he receives in this act, in my presence, to
which I, the Notary, hereby certify, receiving same from the repre-
sentative of the purchaser and to the entire satisfaction of his prin-
cipals, and for which sum he issues a full and effective receipt in
representation of his principals.

FIFTH.   That all the expenses and products of the properties
sold are for the account and charge of the seller, up to this date.

SIXTH.   That as proof of the transfer of ownership and
actual delivery, he executes the present instrument, in his aforesaid

capacity, in favor of the corporation called "Compañía de Aero-
puertos Internacionales S.A.", expressly saving the latter harm-
less in the event of eviction and other contingencies fixed by
law.

SEVENTH.   Mr. José Lopez Vilaboy declares:  That in re-
presentation of his principals, "Compañía de Aeropuertos Inter-
nacionales S.A.", he accepts the above purchase-sale, for all le-
gal effects and purposes, and that the expenses thereby occasioned, also the
recording thereof in the Property Register, will be payable by said
Company.  He further declares:

EIGHTH.   That the Company represented by him has erect-
ed at its expense, on the property described in Clause First here-
of, buildings for the business in which it is engaged, for its
account and with its own money, and about which the other contract-
ing party has been informed.

NINTH.   That being under the necessity of procuring
funds by means of loans, or guaranteeing loans obtained, the Com-
pany has decided to issue Mortgage Bonds to bearer, with the in-
terest and mortgage guarantee hereinafter described, and he ac-
cordingly declares:

That the company hereby issues and places in circulation
thirty mortgage bonds to bearer, numbered 1 to 30, both inclusive,
and with equal degree and preference, for a nominal value of one
hundred and fifty thousand pesos, Cuban currency, each, making a
total of four million five hundred thousand pesos, official cur-
rency, with interest at the rate of 5% per annum, and which will
mature on July 1st in each of the years 1956 to 1985, inclusive,
in guarantee of which he hereby expressly and voluntarily con-
stitutes a first mortgage in favor of the holder or holders of
said bonds, in the corresponding proportions as detailed below.

These bonds will be issued without matrix or stub books,
and therefore, in the event of the summary proceedings stipulated

in the Mortgage Law and regulations thereof, and the mere presentation of said bonds and an authorized copy of this document will suffice for the issuance of a writ of attachment and summary proceedings; the authorizing Notary's certification of the signing of the bonds on this date shall be sufficient for the purpose of identification and authentication of the mortgage bonds.

TENTH.   The said bonds are issued by him, in representation of his principals, subject to the following conditions:

A.   That this first mortgage is expressly and voluntarily constituted for a period to expire on July 1, 1985, with individual maturity of each of the mortgage bonds issued, on the dates indicated therein, respectively, the debtor obligating itself to make payment of the bonds and the corresponding interest, in this city, at its business domicile, located at No.162 Calle de Mercaderes; however, it may be paid off wholly or partially at any time prior to the date indicated, but payment must cover the amount representing the full value of one or more bonds without distinction, that is to say, without dividing the payment of the bond(s) into separate amounts.  In these cases payment shall be made of the principal, the interest up to the date of payment, and three additional months' interest, for cessation of profit, in the understanding that in the event of advance payment, the bonds to be retired first will be those with the latest maturing dates.

B.   The principal of the mortgage bonds will be paid on their respective maturity dates, and will earn interest at 5% per annum, payable half-yearly, both principal and interest to be paid at the domicile of the debtor company; any default in payment of the principal owing or of six months' interest, or non-performance of any of the other conditions stipulated, shall constitute sufficient cause for considering the principal obligation as due and payable, whereupon the bondholder(s) shall have the right to take legal steps for collection of the total amount of the principal, as well as interest and costs. The mere notification by the bondholder(s) of default in payment of the

bonds on their maturity dates, or default in payment of the interest, or of non-performance of any of the other conditions, shall be sufficient for the purpose of legal prosecution and foreclosure.

C. That if the debtor should change its domicile, the bond-holder(s) may give notification of demand for payment through the Official Gazette of the Republic, and such demand shall have the same force and effect as if presented personally to the debtor's representative. Upon the expiration of ten days after the date of the notification, the total credit will be considered as due and payable in full, and the bondholder(s) shall have the right to take legal steps for collection of the principal amount owing, the interest earned and unpaid, as well as the amounts fixed for costs and expenses.

D. The payment of all established taxes and charges, including documentary stamps, as well as those established in the future and levied on the principal and interest, with exception of the Public Works Tax, shall be for the account of the debtor, so that the bondholder(s) shall receive the full amount of the bonds plus interest, without any discount or deduction.

E. That the debtor obligates itself to pay all the expenses and costs that may be occasioned in the event of legal proceedings for collection, including the fees of the lawyer appointed by the creditor(s) and those of the Solicitor if he intervenes in the proceedings; and for such expenses and costs the amount of one hundred and fifty thousand pesos, official currency, is hereby fixed, with respect to five thousand pesos for each bond.

F. That for the purpose of effectuating the payment obligation hereby constituted, and of placing the thirty mortgage bonds, numbered 1 to 30, both inclusive, issued by virtue of this instrument, the Company represented by the deponent hereby acknowledges itself debtor in the sum of four million five hundred thousand pesos, official currency, representing the amount of said thirty mortgage bonds, as if the same

had been received from the persons who will become the holders of said bonds.

G.  That it is an express condition of the issuance of these mortgage bonds that if the bondholder(s) take legal action for the purpose of exercising their rights of collection of the principal and interest, said rights may be exercised by them or through the person designated by them to take charge of the administration of the real estate by which the performance of this obligation is guaranteed; and the Court may be requested to take such action merely upon presentation of an authorized copy of this instrument and the bonds issued, in accordance with the provisions of Article 1528 of the Law of Civil Procedure, or by a decision of "jurisdicción voluntaria" (jurisdiction exercised without the formality of a suit), without the creditor or his authorized representative being required to give security for the exercise of said administration, the right to which is hereby waived by the debtor company.

H.  That in view of the nature of the bonds issued, the credit represented by them may be transferred or encumbered wholly or partially merely by the transfer or delivery thereof, without the necessity of giving notification to the debtor company, the right to which it hereby waives.

I.  That in the event of presentation of an appeal, relative to the decision handed down in foreclosure proceedings instituted in accordance with the Mortgage Law, the debtor hereby waives the security which is required to be given by the creditor for the execution of such decision, as well as that stipulated by Art.175 of the Regulations governing the performance of said Law, hereby obligating itself not to request the withholding of any part of the amount which must be delivered to the foreclosing party by virtue of the attachment proceedings.

J.  That all costs and expenses of the present instrument, fiscal charges and fees of recording in the Property Register, as well as

fees relative to payment, shall be for the account of the debtor
company.

K.  That the debtor agrees to keep the buildings con-
structed on the mortgaged real estate insured against fire, for
their insurable value according to the 80% co-insurance clause, so
long as the mortgage has not been paid; to endorse the policy or
policies for this insurance in favor of the mortgage bondholder(s),
and to keep up to date in the payment of the premiums.

ELEVENTH. That for the purpose of guaranteeing the prin-
cipal represented by the thirty bonds issued, amounting to four
million five hundred thousand pesos, official currency —one hundred
and fifty thousand pesos each bond; the interest thereon; the amount
fixed for costs and expenses, as well as the other stipulations, the
debtor, Compañía de Aeropuertos Internacionales S.A., hereby expressly
and voluntarily constitutes a first mortgage in favor of the holder(s)
of said Mortgage Bonds, in the applicable proportion, on the real es-
tate belonging to it, described in Clause First of this instrument,
on the buildings constructed thereon, described in Clause Second, on
those which are in construction, and on everything else constructed or
increased or enlarged thereon in the future, and also on all properties
which may be merged and attached to the real estate which is the subject
of this mortgage, without any reservation or limitation whatsoever.

TWELFTH.  That for the purposes of Article 127 of the
Mortgage Law, the mortgaged property, including the buildings erected
by said debtor and those which are in process of construction, are eval-
uated at the amount of five million pesos, Cuban currency, this evalua-
tion being made by the deponent in representation of his principals,
so that said amount will be used as a standard in the event of auction
as a result of legal proceedings, hereby waiving any new evaluation or
action taken for that purpose.

THIRTEENTH.  That the literal text of the thirty bearer
mortgage bonds issued by this instrument, numbered one to thirty, is
as follows:

-29

"Bond for One hundred and fifty thousand pesos.

$150,000.00. Cuban Currency. Single Series.

Number _____. Issue in the amount of

Four million five hundred thousand pesos –

($4,500,000.00), Cuban Currency. Maturity date –

July 1, 19 _____.

Compañía de Aeropuertos Internacionales, S.A., domiciled in this
city of Havana, at No.162 Calle de Mercaderes, by virtue of this
Bond, which is signed by its general attorney-in-fact, Mr. José
Lopez Vilaboy, agrees to pay, at its business domicile, to the
bearer of this bond, the amount of One hundred and fifty thousand
pesos, Cuban currency ($150,000.00), on the first day of July,
19____, bearing interest at 5% per annum until the principal amount
of the bond has been fully paid, said interest to be paid every six
months on January 1st and July 1st in each year, upon presentation
of this bond, which is one of thirty bonds issued on this date, all
with equal value, degree and preference; and the payment of the
principal amount of the bond, of interest thereon, of the amount
of one hundred and fifty thousand pesos, Cuban currency, for each
bond, for expenses and costs, and is guaranteed by a first mortgage

✳

Translator's Note:

The wording at this point seems confused. Perhaps it was in-
tended to have this section read as follows –

> "and the payment of the principal amount of
> the bond, namely, one hundred and fifty
> thousand pesos (Cuban currency) for each bond,
> and of interest thereon, as well as costs and
> expenses, is guaranteed by a first mortgage x x "

-30

date before Dr. Francisca Casas y Gomes, Notary of Havana, and recorded in said Notary's archives, the aforesaid document being considered as reproduced herein, and this bond is guaranteed by the mortgage referred to above.

In witness whereof, Compañía de Aeropuertos Internacionales S.A., by its general attorney-in-fact, signs this mortgage bond to bearer, being issued and placed in circulation in Havana, on July 28, 1955.

Compañía de Aeropuertos Internacionales, S.A.

J. Lopez.  José Lopez Vilaboy, Attorney-in-fact.

Dr. Francisca Casas y Gomez, lawyer and public notary of the College and District of this capital city, residing therein, hereby certifies to the authenticity of the above signature of Mr. José Lopez Vilaboy, in his capacity of attorney-in-fact of Compañía de Aeropuertos Internacionales, S.A., who is known to me, said signature having been subscribed in my presence in this act. This bond is one of the thirty bonds issued in accordance with, and subject to, the conditions of Instrument No.149, executed on this same date before me, and recorded in my archives on this same day. Havana, July 28, 1955.

Dr. F. Casas Gomez        (Seal)"

FOURTEENTH.   That the above-mentioned thirty mortgage bonds are hereby issued and placed in circulation in accordance with the above terms and conditions.

FIFTEENTH.  In representation of the said mortgage bonds, and as representative of Compañía de Aeropuertos Internacionales, S.A., and in my presence, to which I, the Notary, certify, Mr. José Lopez Vilaboy hereby issues a provisional certificate for the total issue, which will be exchanged for definitive bonds, as mentioned above, upon presentation of the provisional certificate to the

-31

debtor company, and upon demand, if necessary, the text of said
provisional certificate reading as follows:

"PROVISIONAL CERTIFICATE

Compañía de Aeropuertos Internacionales, S.A.   Issue for
$4,500,000.00.   This certificate represents and entitles the
holder hereof to receive from Compañía de Aeropuertos Internacionales,
S.A., all the Mortgage Bonds issued by this Company, for a total of
4,500,000 pesos, national currency, with interest at 5% per annum, in
accordance with the terms and conditions which are set forth in detail
in Public Instrument No.149, executed on this date before Dr. Francisca
Casas y Gomez, Notary of Havana; Compañía de Aeropuertos Internacionales,
S.A. hereby, and as of this date, confirming and acknowledging that it
is the lawful debtor of the amount of said bonds, pursuant to the terms
and conditions and the mortgage guarantee contained in said instrument,
in favor of whoever may at any time be the holder of this certificate
or of the definitive bonds in substitution of which this certificate has
been issued.

In witness whereof, this provisional certificate is signed by
Mr. José Lopez Vilaboy, as general attorney-in-fact of Compañía de Aero-
puertos Internacionales, S.A.    Havana, July 28, 1955.

Compañía de Aeropuertos Internacionales, S.A.

José Lopez Vilaboy, attorney-in-fact.

Dr. Francisca Casas y Gomez, lawyer and public notary of the
College and District of Havana, residing therein.  I hereby certify to
the authenticity of the above signature of Mr. José Lopez Vilaboy, at-
torney-in-fact of Compañía de Aeropuertos Internacionales, S.A., known
to me, and who signed in my presence in this act; this provisional
certificate, having been issued in representation of thirty mortgage
bonds for one hundred and fifty thousand pesos each (Cuban currency),
will be exchanged in due course for the definitive bonds, in accordance
with the conditions of Instrument No.149, executed on this date before

-32-

me, today, July 28, 1955.   Havana.

Dr. F. Casas Gomez.   (Notarial Seal)"

SIXTEENTH.   That in the event of non-performance on the part of the debtor of any of the obligations contracted by it in this instrument, including, specifically, failure to exchange the above-recited provisional bond certificate, within a period of twenty days after demand by the holder thereof, the obligation will be considered as due and payable, and the holder(s) of the provisional certificate or of the definitive bonds will have the right to take appropriate legal action.

SEVENTEENTH.   The appearing parties designate this city and its courts for all judicial or extra-judicial proceedings which may arise out of this instrument, waiving the jurisdiction of their domiciles, and expressly reserving the preferential legal mortgage which the State, Province and Municipality have, over any other cred-itor.

I, the Notary, gave the required legal admonitions to the appearing parties relative to this instrument.

Declared and authorized by the appearing parties, to whom I, the Notary, read this entire instrument, said parties having waived the right to read it themselves.  The contracting parties accordingly ratify and sign this document.

In witness whereof, - of the fact that I am acquainted with the contracting parties, that their nationalities, citizenship, civil status, occupations and residences are in conformity with their declar-ations; that they have declared under oath that they are income tax-payers, Mr. Pine, voucher No.4399, Fiscal Zone of Oriente, and Mr. Lopez Vilaboy, No.3898 of the same Zone; that the property sold is currently up to date in the payment of the Municipal tax for the first half year of 1955, Municipality of Santiago de las Vegas, folio No.33; that this instrument is signed on the premises of the Banco de Desarrollo Económico y Social, No.258 Calle de Havana, fifth floor; that this docu-ment has been drawn up in accordance with the instructions received from

-33

the contracting parties, and to all the other declarations, I,
the Notary, hereby certify.  Further, that the delivery of the
sale price mentioned in Clause Fourth of this instrument, name-
ly, one million fourteen thousand four hundred and thirty-four
pesos and ninety-nine centavos, Cuban currency, is effectuated
by means of administration check No.8339 of the Banco Nacional
de Cuba, dated today, for said amount, to the order of Compañía
de Aeropuertos Internacionales, S.A., and endorsed by the latter
to the order of Pan American Airways, Inc., - in Spanish, "Com-
pañía Pan Americana de Comunicaciones Aéreas" - which receives
it in this act; to which the undersigned Notary hereby certifies.

(Enumeration of corrections approved by the parties)

    WARREN A. PINE      J. LOPEZ      Dr. F. Casas Gomez


    The foregoing is in conformity with the original document,
No.149, recorded in my protocol of public instruments of the pre-
sent year, at my Notarial Office.  This first certified copy, con-
sisting of 24 double pages, signed by me, is issued for Compañía
de Aeropuertos Internacionales, S.A.  A notation of its issuance
has been made in the margin of the original record.  Cancelled
documentary stamps affixed.  Certified in Havana, on the date of
its execution.