**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 25-25575-CIV-MORENO

_____

JOSE RAMON LOPEZ REGUEIRO,

     Plaintiff,

v.

DELTA AIR LINES, INC.,

     Defendant.

_____

### <u>DELTA AIR LINES' MOTION TO DISMISS AND<br>CLAIM OF UNCONSTITUTIONALITY</u>

Since 2016, the United States government has expressly authorized Defendant Delta Air Lines to provide scheduled flights from the U.S. to the José Martí International Airport in Havana (the "Airport"). Over the next decade, Delta's Havana flights allowed countless Americans to engage in licensed travel to Cuba, consistent with federal policy. Now, six years after intimating that he would sue Delta and six years after he launched similar claims against other airlines, Plaintiff Jose Ramon Lopez Regueiro now asserts that Delta's approved use of the Airport constitutes trafficking in confiscated property. Lopez Regueiro's reluctance to sue Delta was warranted because his suit is legally barred many times over.

*First*, Lopez Regueiro acquired his uncertified claim (the "Claim") too late. The Helms-Burton Act required him to acquire the Claim before March 12, 1996. But documents attached to the Complaint reveal that he had no possession or control of any claim until at the earliest 2010. Indeed, the Complaint and its attachments reveal that Lopez Regueiro was a Cuban National who

1

could not have inherited any assets from Jose Lopez Vilaboy (who died in the United States) before 1996, because the Cuban sanctions regime blocked such transfers.

*Second*, this suit is barred by Delta's own certified claim. Indeed, this is the first Helms-Burton suit brought against a certified claimant by someone with an uncertified claim including the same property. Here, Plaintiff Lopez Regueiro alleges that he inherited an uncertified claim to the Airport. He asserts that Delta "trafficked" in that Airport by flying to it. But in 1962, the Cuban government confiscated Delta's property in Cuba—including offices at the Airport—and the United States Foreign Claims Settlement Commission ("FCSC") certified Delta's claim to that confiscated property. The Helms-Burton Act was intended to *benefit* certified claimholders, not to expose them to suits by those lacking such claims.

*Third*, the suit also fails as a matter of law because, on its face, it alleges only that Delta engaged in lawful travel to Cuba, based on judicially noticeable federal orders expressly authorizing Delta to use this Airport.

*Fourth*, if the case cannot be resolved on these statutory grounds, the suit must be dismissed because the Helms-Burton Act's private right of action is unconstitutional: Congress may not create a right of action that can be "suspended" at will by the President, as is the case here.

## BACKGROUND

Plaintiff Lopez Regueiro alleges that he is the son and heir of Vilaboy. He says Vilaboy was the owner of a Cuban company called Compañia de Aeropuertos Internacionales, S.A. ("CAISA"), which allegedly purchased the Havana Airport in 1952. Compl. ¶ 21. "In or around May 1959," the Cuban government allegedly confiscated both CAISA and the Airport from Vilaboy. *Id.* ¶¶ 21-22. Vilaboy ultimately settled in the United States, but because he was a Cuban

2

national at the time his property was allegedly confiscated, the United States never certified his claim to the confiscated property. *Id.* ¶ 30. Vilaboy died intestate in Florida in 1989. *Id.* ¶ 27.

In 2010, twenty-one years after Vilaboy's death, Lopez Regueiro petitioned a Florida probate court to declare him Vilaboy's heir. *Id.* Ex. B at 5. In response, the court appointed a Guardian ad Litem to investigate Lopez Regueiro's claim and to identify other potential heirs. *Id.* The Guardian's report includes two letters ostensibly written by Vilaboy to Lopez Regueiro, and two accounts of witnesses who reported that they knew Lopez Regueiro as Vilaboy's son in Cuba. *Id.* Ex. B at 5-6. The Guardian could not locate Vilaboy's wife, Carmen Bagur. *Id.* at 6-7. Ultimately, the court entered an order declaring Lopez Regueiro an heir to half of Vilaboy's estate. *Id.* Ex. D. at 2. The Court also directed that Ms. Bagur's "half-share of the Decedent's estate in any future probate proceedings shall be placed in the court's register." *Id.*

Six years later, in 2016, following President Obama's own historic visit to Cuba, the United States government began authorizing scheduled commercial flights from the United States to the Airport. The Department of Transportation allowed Delta to fly three routes to Havana from Miami, Atlanta, and New York. *See* Final Order, 2016 U.S.-Cuba Frequency Allocation Proceeding, No. DOT-OST-2016-0021 (Aug. 31, 2016) (Ex. A). These were Delta's first regularly scheduled flights to Cuba since 1962, when the Cuban government confiscated Delta's property in Cuba, including its office space at the Airport. *See In re Delta Air Lines, Inc.*, No. CU-3972, at 2 (FCSC Oct. 1, 1969) (Ex. B). The FCSC certified Delta's claim to this confiscated property, awarding Delta a claim worth $212,396.08, plus interest. *Id.*

Lopez Regueiro now asserts that Delta's use of the Airport, as part of flights that have always been authorized by the United States government, constitute "trafficking" in the property.

## ARGUMENT

**I.**    **Lopez Regueiro acquired his claim too late to bring suit.**

Lopez Regueiro did not acquire his claim to the Property before March 12, 1996. The Act states: "In the case of property confiscated before March 12, 1996, a United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996." 22 U.S.C. § 6082(a)(4)(B). That provision "includes inheritance," so a plaintiff who "acquired his interest in the property through inheritance after" March 12, 1996, may not bring suit under the Act. *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 931 (11th Cir. 2023).

The question of when an individual "acquires ownership of the claim" is one of federal law, *Fernandez v. Seaboard Marine LTD.*, 135 F.4th 939, 948 (11th Cir. 2025), and the Eleventh Circuit has held that "acquires" means "[t]o gain possession or control of; to get or obtain." *Garcia-Bengochea*, 57 F.4th at 930. The acquisition question thus boils down to a simple one: in March 1996, did Lopez Regueiro have possession or control of ownership of the Claim? *Id.* He did not.

> **A.**    *Lopez Regueiro did not acquire the Claim until the 2010 probate proceedings.*

**1.** Lopez Regueiro did not "acquire" this Claim until well after the cutoff date. His probate documents are attached to the Complaint, so they can be considered on a motion to dismiss. *E.g.*, *Turner v. Williams*, 65 F.4th 564, 583 n.27 (11th Cir. 2023). Those documents show that in 1996, Lopez Regueiro had not yet inherited the Claim, and had neither "possession" nor "control of" the Claim. *Garcia-Bengochea*, 57 F.4th at 930. Instead, he obtained an order declaring him to be one of Vilaboy's heirs in 2010, fourteen years after the cutoff date. Compl. Ex. D. That order came only after the court appointed a Guardian ad Litem, who gathered evidence, spoke to witnesses, and reviewed documents to determine whether Lopez Regueiro was an heir. Compl. Ex. B at 5.

Put another way, the probate documents make clear that Lopez Regueiro did not possess the Claim in 1996: at that time, he was not even a recognized heir, and he certainly had no possession over the Claim. Indeed, the order suggests that Lopez Regueiro does not even possess the Claim now because it contemplates "further probate proceedings" before assets are distributed. Compl. Ex. D at 2 ("Because the whereabouts of Carmen Bagur are unknown, her half-share of the Decedent's estate in any future probate proceedings shall be placed in the court's register.").

Even if no *further* probate proceedings are needed to distribute the Claim, Lopez Regueiro did not have "possession" or "control of" the estate's assets before the 2010 order declaring him one of Vilaboy's heirs. *Garcia-Bengochea*, 57 F.4th at 930. Indeed, Lopez Regueiro presumably initiated the probate proceedings (and attached them to his Complaint) precisely because he had no possession or control of the Claim without such an order. Thus, under *Garcia-Bengochea*, he did not "acquire" the Claim before March 12, 1996, and cannot bring the suit. *See Fernandez*, 135 F.4th at 948.

**2.** Under Florida law, the result is the same: Lopez Regueiro did not acquire the Claim before the probate proceedings declaring him an heir. Before that, the Claim was part of the Vilaboy estate. To be sure, an heir's right to inherit property "vests" upon death of the testator (converting from a mere expectancy to a vested interest). *See In re Mooney's Est.*, 395 So. 2d 608, 609 (Fla. 5th DCA 1981); Fla. Stat. § 732.101(2) ("The decedent's death is the event that vests the heirs' right to the decedent's intestate property."). But Florida law nonetheless recognizes that the decedent's estate acquires the decedent's property pending administration and distribution of the assets. *See Depriest v. Greeson*, 213 So. 3d 1022, 1025-26 (Fla. 1st DCA 2017) (holding that "Decedent's car was an asset of the estate, it did not belong to anyone individually" where "[u]ltimate ownership of the car would not be determined until after resolution of claims, taxes,

debts, expenses of administration, and other obligations of the estate, if any")[1]; *Sharps v. Sharps*, 214 So. 2d 492, 495 (Fla. 3d DCA 1968) (distinguishing between a joint checking account, which immediately converted to wife's asset upon husband's death, and a check, which became "an asset of the husband's estate" upon husband's death). Thus, the Eleventh Circuit has explained that Florida estates acquire an interest in Helms-Burton claims after the original owner dies. *Fernandez*, 135 F.4th at 948-49. That accords with the probate court's 2010 order, which contemplates that the assets of the long-deceased Vilaboy would be distributed in future proceedings that adequately protect Carmen Bagur. Accordingly, under Florida law, the Claim remained property of the estate in 1996, and so Lopez Regueiro failed to acquire the Claim in time.

>    B.    *OFAC regulations blocked Lopez Regueiro from acquiring the Claim in time.*

Finally, even if Florida law ordinarily would have vested Lopez Regueiro with the Claim when his father died, the Office of Foreign Asset Control ("OFAC") regulations prevented any such acquisition before March 12, 1996. That follows because Lopez Regueiro was a blocked Cuban national at the time. Under the Cuban Asset Control Regulations ("CACR"), a Designated National is anyone who was a "subject or citizen of [Cuba]" and/or "domiciled in or a permanent resident of [Cuba]" after the CACR came into effect (which was July 8, 1963). *See* 31 C.F.R. §§ 515.302; 515.305; 515.201(d) (1989 edition).[2] When a Designated National is an heir or beneficiary of a decedent's estate, the estate is treated as a "blocked estate," § 515.327, and the Cuban national may not receive their share of the estate. *See Tagle v. Regan*, 643 F.2d 1058, 1064

---

[1] The decedent in *Depriest* left a will, which is governed by the similar principle that "[t]he death of the testator is the event that vests the right to devises unless the testator in the will has provided that some other event must happen before a devise vests." Fla. Stat. § 732.514.

[2] Downloaded from: https://www.loc.gov/item/cfr1989116-T31CVP515/ (last accessed April 27, 2026).

n.8 (5th Cir. Unit B 1981) ("Any attempt by the Cuban heir to withdraw his share of the assets remains blocked …."); *see also* § 515.523(c).[3]

Here, the Complaint and its attachments show that Lopez Regueiro was born in Cuba. Compl. ¶ 27 n.9 & Ex. B (citing and attaching Lopez Regueiro's Cuban birth certificate). And the Complaint suggests that even after Vilaboy left Cuba in or after May 1959, *id.* ¶ 22, Lopez Regueiro nonetheless remained in Cuba. *Id.* ¶ 28 (alleging that Lopez Regueiro took possession of his father's shares when "his father left Cuba"). That Lopez Regueiro continued to live in Cuba long after his father left is confirmed by the Report of the Guardian ad Litem. *Id.* ¶ 27 n.9 & Ex. B at 5-7. The Report identifies two witnesses who stated that Lopez Regueiro was living in Cuba during the time they knew Vilaboy, Compl. Ex. B at 5-6 (recounting how Mr. Benavines took a picture of Vilaboy to "Mr. Regueiro, who was residing in Cuba at the time," and how Mr. Toirac recalled Vilaboy's discussion of "his son in Cuba, believed to be … Lopez Regueiro"). One of

---

[3] Ordinarily, a Cuban heir's interest in an estate would cause all distributions from the estate to be blocked. But in *Tagle*, the Eleventh Circuit's predecessor held that U.S. nationals could inherit from an estate notwithstanding the Cuban heir's interest, because 31 C.F.R. § 515.525(a)(2) authorizes "[a]ny transfer to any person by intestate succession." *Tagle*, 643 F.2d at 1064. Despite that regulation, the Court explained that the CACR prohibits the Cuban heir from "withdraw[ing] his share of the assets." *Id.* at n.8; *see also De Cuellar v. Brady*, 881 F.2d 1561, 1567 (11th Cir. 1989); *Ferrera v. United States*, 424 F. Supp. 888, 889-90 (S.D. Fla. 1976); Fl. Attorney General Opinion, *Inheritance by Cuban National*, Fl. AGO 84-02 (Jan. 12, 1984), *available at* https://www.myfloridalegal.com/ag-opinions/inheritance-by-cuban-national. In other words, even if a designated national is entitled to inherit under state law, that property is treated as blocked unless specially licensed. *See* Fl. Attorney General Op., *supra* ("In sum, while it would appear that aliens are entitled under state law to take … property through … intestate succession, in view of the [CACR] … personal assets of a resident decedent's estate which are subject to the regulations should not be distributed or transferred or ordered to be distributed or transferred to a Cuban national or resident of Cuba."); *see also* 31 C.F.R. § 515.523(c) (1989 ed.) (requiring that property interests "distributed" to a designated national during administration of an estate be treated as blocked).

those witnesses knew Vilaboy for just "over four years" before his death in 1989, yet even he identified Lopez Regueiro as Vilaboy's "son in Cuba." *Id.* at 5-6.[4]

In light of these allegations, Lopez Regueiro's conclusory assertion that he acquired the Claim in 1989 is not plausible—indeed, it is contrary to law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As a Designated National, he was prohibited from acquiring anything from Vilaboy's U.S. estate, and any attempt to transfer the Claim would have been blocked as a matter of law. *Tagle*, 643 F.2d at 1064 n.8; *see also* 31 C.F.R. § 515.203(a) ("Any transfer … in violation of any provision of this part … is null and void and shall not be the basis for the assertion or recognition of any interest in or right, remedy, power or privilege with respect to such property."). Because Lopez Regueiro has pleaded no facts giving rise to a plausible inference that he could have lawfully acquired the Claim before March 12, 1996, he is ineligible to bring suit under the Act.

## II.   <u>Delta's certified claim bars this suit.</u>

The Helms-Burton Act recognizes two types of claims: certified claims and uncertified ones. *See De Fernandez v. Seaboard Marine, Ltd.*, 2022 WL 2237186, at *2 (S.D. Fla. June 22, 2022). Certified claims are those recognized by the Foreign Claims Settlement Commission. 22 U.S.C. § 6083(a). Uncertified claims have not been recognized by the Commission. *See id.*

---

[4] This is confirmed in multiple reports from a press conference at the offices of Plaintiffs' attorneys: Lopez Regueiro lived in Cuba until 1989, after which he moved to Europe, and then in 2009 moved to Miami. *See* Fox Business, *Cuban-American claims to be rightful owner of Havana airport, sues airlines*, https://www.foxbusiness.com/industrials/cuban-american-claims-to-be-rightful-owner-of-havana-airport-in-lawsuit (last accessed April 27, 2026); WLRN, *American Airlines Sued for Operating on Seized Property in Cuba*, https://www.wlrn.org/news/2019-09-25/american-airlines-sued-for-operating-on-seized-property-in-cuba (last accessed April 27, 2026). Under the CACR then in effect, moving to Europe did not automatically cause him to become unblocked: at that time, Designated Nationals who "took up residence" in Europe could "apply to [OFAC] to be specifically licensed as unblocked nationals," but there is no allegation that Lopez Regueiro did so. 31 C.F.R. § 515.505(b) (1989 edition). Those regulations were amended in 2015, 80 Fed. Reg. 2291 (Jan 16, 2015) ("OFAC is amending section 515.505 to unblock accounts of Cuban nationals who have permanently relocated outside of Cuba."), but that was too late for Lopez Regueiro.

§ 6083(a)(2). "The Act favors certified claims." *Lamb v. ITT Corp.*, 2010 WL 376858, at *4 n.2 (D. Neb. Jan. 26, 2010). Indeed, certified claims offer "conclusive proof of ownership of an interest in property," *Havana Docks Corp. v. Carnival Corp.*, 2022 WL 1642756, at *18 (S.D. Fla. Apr. 1, 2022), entitle their holder to "increased damages," 22 U.S.C. § 6082(a)(3)(A), and unlock early access to the courts, *id.* § 6082(a)(5)(C).

Here, Lopez Regueiro does not purport to own a certified claim. Compl. ¶ 30. Instead, he claims to hold an uncertified claim to the entire Airport. *Id.* ¶ 27. But that cannot be right because Delta owns a certified claim to the Airport.[5] As the Foreign Claim Settlement Commission explained, Delta maintained an office "at the José Martí International Airport." *See In re Delta Air Lines, Inc.*, No. CU-3972, at 2 (FCSC Oct. 1, 1969) (Ex. B). That property was confiscated from Delta "on January 12, 1962, by Resolution 154[.]" *Id.* Delta thus owns a certified claim to at least a portion of the Airport.

Delta's certified claim bars this suit three times over. *First*, the Helms-Burton Act itself prohibits an uncertified claim holder from asserting a claim owned by a certified one. *Second*, as a certified claim holder, Delta can—and did—give itself permission to use the Airport. Such authorization precludes a Helms-Burton suit. And *third*, at a minimum, Delta's certified claim to the Airport makes it impossible that Delta knowingly and intentionally trafficked when it used that same airport.

---

[5] The certified claims of Delta, National Airlines, and Starwood Hotel and Resorts Worldwide, Inc. are judicially noticeable because they are government documents, published by the FCSC. *See Van Beneden v. Al-Sanusi*, 12 F. Supp. 3d 62, 70 n.7 (D.D.C. 2014) ("The Court takes judicial notice of the FCSC decisions."); *see also Rucker v. Royal Caribbean Cruises Ltd.*, 2024 WL 6469240, at *7 (S.D. Fla. July 24, 2024) (courts "may take judicial notice of the rules, regulations and orders of administrative agencies issued pursuant to their delegated authority."); *Sw. Georgia Fin. Corp. v. Colonial Am. Cas. & Sur. Co.*, 2009 WL 1410272, at *1 (M.D. Ga. May 19, 2009) (noting that "orders of administrative agencies" may be judicially noticed). Delta thus asks the Court to take judicial notice of the FCSC claims under Federal Rule of Evidence 201.

        *A.      Delta's certified claim precludes Plaintiff's uncertified claim.*

The Act is clear that "[a]n interest in property for which a United States national has a claim certified under title V of the International Claims Settlement Act of 1949 may not be the subject of a claim in an action under this section by any other person." 22 U.S.C. § 6082(a)(5)(D). That provision defeats this suit. Quite simply, Delta has a certified "interest in property" in the Airport. And so, Lopez Regueiro cannot pursue "an action" addressing that same "subject."

Two textual phrases make that result plain. *First*, the certified-claim bar applies to any certified "interest in property." That sweeps broadly. Property itself is defined as "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest." 22 U.S.C. § 6023(12). And an interest in property sweeps beyond that: covering not just the property itself, but any component of it. *E.g.*, *In re Constr. Supervision Servs., Inc.*, 753 F.3d 124, 128 (4th Cir. 2014) ("interest in property" is a "broad term"); *In re 229 Main St. Ltd. P'ship*, 262 F.3d 1, 6 (1st Cir. 2001) (explaining that term "interest in property" is "broader" than the term "lien").

*Second*, the bar precludes any suit that would make the interest in property the "subject of a claim." "Subject" means "[t]he matter of concern over which something is created." Subject, Black's Law Dictionary (12th ed. 2024). And when it is combined with the preposition "of," "subject" means the basis of inquiry. *E.g.*, *Chirinos-Raudales v. People*, 532 P.3d 1200, 1204 (Co. 2023); *State ex rel. Johnson v. Youngquist*, 13 N.W.2d 296, 296-97 (S.D. 1944).

Combining those two phrases, the certified-claim bar precludes an uncertified suit whenever the property claimed is broad enough that it would make a certified property interest the subject of the judicial inquiry. That is the case here. Plaintiff claims an interest in the entire Airport.

Compl. ¶ 27. Assessing that claim will require an inquiry into what Delta owned. Said differently, assessing Plaintiff's claim will make Delta's claim the "subject of" the suit. After all, to even determine what Plaintiff owned, and thus, what Plaintiff can claim, Delta's ownership of property at the same spot will have to be considered. *E.g.*, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd.*, 119 F.4th 1276, 1288 (11th Cir. 2024) (explaining the interaction between fee-simple owners and lease holders under the Act). Plaintiff's suit—again, which claims the entire Airport—puts Delta's certified claim to that same airport at issue.

Plaintiff's suit is therefore barred even though the uncertified interest he asserts—the entire Airport—may be broader than Delta's certified interest in confiscated offices at the Airport. The Act is clear that nothing in Helms-Burton can "supersede[], amend[], or otherwise alter[]" a certified claim. 22 U.S.C. § 6083(c). It would thus violate a fundamental principle of the Act if, in the process of adjudicating an uncertified claim, a certified claim was incidentally given a narrowing reading. Likewise, it would disobey Congress if a jury adjudicating an uncertified claim gave a certified claim anything but "conclusive" weight. 22 U.S.C. § 6083(a). To avoid those intractable problems, the Act leaves breathing room around certified claims. If an uncertified claim at all puts a certified claim at issue, the suit is barred. 22 U.S.C. § 6082(a)(5)(D).

That is especially warranted here because Delta is not the only certified claimant with a claim to the Airport. The Foreign Claim Settlement Commission also concluded that Starwood Hotels has a claim to "425,000 square meters of land" that was "seized" "in 1968" "for extension of the airport runway." *See In re Starwood Hotels & Resorts Worldwide, Inc.*, No. CU-2-001, at 4 (FCSC Apr. 7, 2006) (Ex. C). Again, that defeats the claim here. There is no way to assess

11

Plaintiff's claim to the entire Airport without considering Starwood's certified claim to the "runway." *See* Compl. ¶ 31 (arguing that Delta trafficked by landing flights on the runway).[6]

In short, multiple certified claims to the Airport preclude this suit. Plaintiff cannot proceed on an uncertified claim to the Airport when there are so many certified "interests in property" to the same Airport. 22 U.S.C. § 6082(a)(5)(D).

> B.  *As a certified claimholder, Delta can—and did—authorize its use of the Airport.*

Under the Act, trafficking is possible only when the defendant acts "without the authorization of any United States national who holds a claim to the property." 22 U.S.C. § 6023(13)(A). Delta, which holds a claim to the Airport, plainly authorized its own use of the Airport. And because the plain text states that "any" claimholder may authorize use of the property, Delta's conduct cannot constitute trafficking.

As the Supreme Court explained, "the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (internal citation and quotations omitted). And the Eleventh Circuit has held that "any" means "'one, some, or all indiscriminately of whatever quantity' or 'one, some, every, or all without specification.'" *Hoak v. Ledford*, 153 F.4th 1148, 1158 (11th Cir. 2025) (citations omitted). Indeed, that is how "any" is used in normal speech. For example, if a principal told an assembled class of test takers, "you can leave the test room with the permission of any teacher," everyone would understand that a student needs permission from one teacher (no matter which one) to leave

---

[6] Still other certified claims may impact Plaintiff's claim to the Airport. National Airlines, for example, flew from Miami to Havana throughout the 1950s. Its Cuban subsidiary, which handled "traffic and sales functions" in Havana, was confiscated. *See In re National Airlines, Inc.*, No. CU-3452 at 2-3 (FCSC Mar. 5, 1969) (Ex. D). It is likely that National Airlines, whose claim includes "leases," *id.*, also implicates the airport given its presence there.

the room. Nobody would think the student needed permission from *multiple* teachers, let alone every teacher.

And context makes clear that is how "any" is used in this statute. The statute is written in the singular. It thus tracks perfectly if any means "one … indiscriminately." *Ali*, 552 U.S. at 219. The statutory text can easily accommodate that interpretation—"without the authorization of [a] United States national who holds a claim to the property"—makes grammatical sense. By contrast, if any means "all" or "more than one," then the statute is ungrammatical: it is wrong to say "without the authorization of [all] United States national who holds a claim to the property." The subjects and verbs do not line up.

In short, the only grammatical way to read the statute is that authorization from any one claimholder defeats a claim. And to determine whether there are multiple claimholders, courts must look to the property claimed. After all, authorization must be made with reference to "the property." 22 U.S.C. § 6023(13). "The" is a definite article, and "[d]efinite articles refer to one specific object." *Harrington v. Veritext, LLC*, 2024 WL 5054928, at *7 n.7 (S.D. Fla. Dec. 10, 2024). The "specific object" being authorized must be the property being trafficked. Here, the only property Plaintiff claims is the entire Airport. Compl. ¶ 27. That makes the authorization analysis easy. Delta could not have trafficked: it "holds a claim to the property" because it had a lease to the Airport, *Compare* Compl ¶¶ 27, 29 *with In re Delta Air Lines, Inc.*, No. CU-3972, at 2 (Ex. B), and so, Delta could authorize its use of the Airport.

### C.     *Delta did not act with scienter.*

To be liable, a Helms-Burton defendant must "knowingly and intentionally" traffic. 22 U.S.C. § 6023(13). Because lack of authorization is part of the definition of trafficking, a Helms-Burton defendant must know that he lacks authorization to be held liable. *Cf. Del Valle v. Trivago*

*GMBH*, 2025 WL 1443951, at *4 (11th Cir. May 20, 2025); *see also Ruan v. United States*, 597 U.S. 450, 458 (2022) (mens rea terms typically modify every element). But here, Delta could not have known that it lacked authorization because Delta *had* authorization through its own certified claim to the Airport.

Plaintiff alleges, notwithstanding Delta's certified claim, that Delta should have known that he, also, held a claim to the property. Compl. ¶¶ 35, 37. But nothing Plaintiff provided to Delta acknowledged Delta's certified claim or explained why Delta's own authorization was insufficient. Delta cannot be said to have "knowingly and intentionally" trafficked without authorization when Delta could reasonably rely on its own certified claim for authorization. Moreover, even defendants who lack certified claims are entitled to disbelieve a plaintiff's "[b]are, unsworn assertions of property ownership," even when those assertions are made in a federal complaint. *Del Valle*, 2025 WL 1443951, at *6. Surely Delta, in possession of a certified claim covering the very Airport in which Lopez Regueiro asserted an uncertified claim, was entitled to doubt Plaintiff's claim. Here, as in *Del Valle*, Lopez Regueiro failed to allege that Delta was on notice of documents making his claim to confiscated property "highly probable," 2025 WL 1443951, at *6, so his claim must be dismissed.

### III.   <u>Delta engaged in exclusively lawful travel.</u>

Under the Act, there is no liability for "transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel," which is expressly carved out of the definition of "trafficking." 22 U.S.C. § 6023(13)(B)(iii). That broad carve-out for lawful travel was a key part of the legislative compromise that resulted in the Helms-Burton Act: as the Conference Report explains, "[t]he definition of 'traffics,' as used in Title III, has been modified to *remove any liability for . . . any*

14

*activities related to lawful travel to Cuba.*" 142 CONG. REC. H1645-02, 1996 WL 90487, at H1656 (emphasis added). Although courts have treated "lawful travel" as an affirmative defense, it is black letter law that when an affirmative defense is apparent on the face of the complaint, the case must be dismissed. *Wells v. Brown*, 58 F.4th 1347, 1356-57 (11th Cir. 2023) (en banc).

Here, the Complaint alleges only that Delta engaged in lawful travel—indeed, the flights to Havana described in the Complaint are among the few forms of lawful travel available for Americans today. Under Rule 201, the Court can take judicial notice of the U.S. Government licenses authorizing Delta to fly scheduled services on specific routes to Havana's José Martí International Airport. *See, e.g.*, Final Order, 2016 U.S.-Cuba Frequency Allocation Proceeding, No. DOT-OST-2016-0021 (Aug. 31, 2016) (Ex. A) (authorizing Delta to begin services to Havana from JFK, Atlanta, and Miami, and noting (at n.1) that the José Martí International Airport is the only one authorized for service to Havana).[7] Because Delta's use of this airport for travel to Havana was expressly authorized, there can be no question that the alleged conduct is both "incident to" and "necessary to" lawful travel to Cuba. 22 U.S.C. § 6023(13)(B)(iii). Indeed, these flights through the Havana Airport are often the *only* way Americans may lawfully travel to Cuba. For example, in 2019, Secretary of State Pompeo asked the Department of Transportation to revoke authorization for scheduled flights to all other Cuban airports, but nonetheless asked that flights to *this* Airport remain authorized, explaining: "Maintaining flights to Jose Marti International Airport preserves the main gateway for travel from the United States to Cuba on commercial flights for

---

[7] The U.S. Government publishes these orders in the Department of Transportation Docket on www.regulations.gov. *See also, e.g.*, Order to Show Cause, 2017 U.S.-Cuba Frequency Allocation Proceeding, No. DOT-OST-2016-0021 (Mar. 30, 2018) (allocating an additional Miami – Havana frequency to Delta), *finalized at* Final Order (Apr. 20, 2018) (Ex. E); Order Denying Motion, No. DOT-OST-2016-0021 (Nov. 9, 2018) (Ex. F) (restating Delta's authorized Havana routes and denying American's motion to allow airlines to freely fly from additional cities).

family visitation or other lawful purposes." Letter from Sec. Pompeo to Sec. Chao, attached as Appendix to Oct. 25, 2019 Notice, DOT-OST-2016-0021 (Ex. G). That request was granted, so for years, the José Martí International Airport was the only airport to which flights were authorized from the United States. Notice, DOT-OST-2016-0021 (Oct. 25, 2019) (Ex. G).

On its face, therefore, the Complaint pleads only lawful travel, so the suit may be dismissed even if lawful travel is an affirmative defense. Lopez Regueiro attempts to avoid this problem by making the conclusory allegation that "Defendant transports passengers in violation of applicable [CACRs] promulgated by [OFAC]." Compl. ¶ 33. But the Complaint fails to allege any facts that plausibly support this bare conclusion; indeed, he does not even state what regulations he believes were violated, or how. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561 (2007) (rejecting theory that "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery"). Moreover, this suit is unlike others in which the lawful-travel exception was held unsuitable for resolution on a motion to dismiss. For example, there is no assertion that Delta provided (nor was required to provide) any "shore excursions," like those considered in *Havana Docks*.[8] And there is no allegation that Delta's use of the Airport was marketed to tourists, unlike the resorts in *Echevarria v. Expedia Group*.[9]

---

[8] *Havana Docks Corp. v. Carnival Corp.*, 592 F. Supp. 3d 1088, 1174-1189 (S.D. Fla. 2022), *rev'd*, 119 F.4th 1276 (11th Cir. 2024). Thus, Delta respectfully submits that the Magistrate Judge's recommendation to deny a motion to dismiss based on lawful travel in *American Airlines* was incorrect: that Recommendation relied exclusively on cruise-line cases, which are distinguishable. *Regueiro v. Am. Airlines*, 2022 WL 2399748, at *10 (S.D. Fla. May 20, 2022), *adopted in part*, 2022 WL 2352414 (S.D. Fla. June 30, 2022), *rev'd on other grounds*, 147 F.4th 1281 (11th Cir. 2025).

[9] *Echevarria v. Expedia Grp., Inc.*, No. 19-cv-22621, DE 77, Amended Compl. ¶¶ 64-65, 75-76 (Jan. 4, 2021).

A contrary conclusion would likely violate the Due Process Clause: Delta may not be held liable for conduct that was (and still is) expressly authorized and encouraged by the Government. *See Cox v. Louisiana*, 379 U.S. 559, 571 (1965); *Raley v. Ohio*, 360 U.S. 423, 438 (1959). The Constitution forbids this "indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State had clearly told him was available to him." *Raley*, 360 U.S. at 426. Under the doctrine of Constitutional avoidance, the Court may avoid reaching this important constitutional question by holding that the Complaint alleges only lawful travel, excluded from the reach of the Helms-Burton Act. *See*, *e.g.*, *Pine* v. *City of West Palm Beach*, 762 F.3d 1262, 1270-1271 (11th Cir. 2014).

### IV.     The Helms-Burton private cause of action is unconstitutional.

Finally, the Helms-Burton Act's cause of action is unconstitutional. "The leading Framers of our Constitution viewed the principle of separation of powers as the central guarantee of a just government." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 870 (1991). Therefore, "[t]ime and again," the Supreme Court has "reaffirmed" its "importance in our constitutional scheme." *Morrison v. Olson*, 487 U.S. 654, 693 (1988). Congress, performing an exclusively legislative act, created a private right of action in the Act, but allowed the President to suspend it immediately on, or after, the Act's effective date, and also allowed the President to reinstate the cause of action if suspended. In so doing, Congress delegated legislative powers to the President, contravening fundamental constitutional principles and requirements.

"That congress cannot delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892); *see also Loving v. United States*, 517 U.S. 748, 758 (1996). And "[t]o create a new cause of action is to assign new private

17

rights and liabilities—a power that is in every meaningful sense an act of legislation." *Egbert v. Boule*, 596 U.S. 482, 503 (2022) (Gorsuch, J., concurring). Thus, the Supreme Court has long-recognized that "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).

There is no question that the private cause of action in Helms-Burton is an exercise of legislative power. But what about the suspension provision? That, too, is an exercise of legislative power. A President's suspension, or reinstatement, of the private right of action is tantamount to amendment of the Act. Imagine (counterfactually) if the Act had become law with a private right of action but without a suspension provision. How could post-enactment suspension of that private right of action have been achieved? The answer is obvious: only with an amendment to the Act, in accordance with specific procedures outlined in the Constitution. *Cf. INS v. Chadha*, 462 U.S. 919, 953-54 (1983). That a new law would be required to accomplish post-enactment suspension evidences the "legislative character" of the President's suspension and reinstatement. *Id.* at 952.[10]

The suspension provision cannot be severed. To be sure, the Act has a severability clause. But such clauses are not inexorable. Courts will find laws inseverable despite a severability clause when there "is strong evidence that Congress intended" as much. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 234 (2020) (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987)). Here, there is "strong evidence" that the Act would not have been enacted without the suspension provision. The inclusion of the private cause of action triggered threat of a veto, 141 Cong. Rec. S15108 (daily ed. Oct. 12, 1995), and the Act's suspension authority was included "at the request of the Executive branch" to "afford the President flexibility." 142 Cong. Rec. H1645-

---

[10] The suspension provision also violates the Presentment Clause by permitting the President to effectively amend the Act without satisfying the Constitution's "finely wrought" procedures. *See Clinton v. City of New York*, 524 U.S. 417, 439-40, 447 (1998); *Chadha*, 462 U.S. at 951.

02, H1662, 1996 WL 90487. So too, the Act's private right of action and the provision permitting its suspension were "obviously meant to work together," and cannot be severed from one another. *Murphy v. NCAA*, 584 U.S. 453, 483 (2018).

## CONCLUSION

For all these reasons, the complaint should be dismissed.

Dated: April 28, 2026

Respectfully submitted,

By: */s/ Stuart H. Singer*
Stuart H. Singer
(Florida Bar No. 377325)
Pascual A. Oliu
(Florida Bar No. 107737)
Evan M. Ezray
(Florida Bar No. 1008228)
Corey P. Gray
(Florida Bar No. 115473)
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com

*Counsel for Delta Air Lines, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on all counsel of record via the court's CM/ECF System on April 28, 2026.

By: */s/ Stuart H. Singer*
Stuart H. Singer

19